# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

CHARLES LEE WHITE,
          *Defendant-Appellant.*

No. 07-10460

D.C. No.
CR-03-00042-FCD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, Senior District Judge, Presiding

Argued and Submitted
January 10, 2012—San Francisco, California

Filed February 29, 2012

Before: J. Clifford Wallace and Milan D. Smith, Jr.,
Circuit Judges, and Jed S. Rakoff, Senior District Judge.*

Opinion by Judge Wallace

---

*The Honorable Jed S. Rakoff, Senior District Judge for the Southern District of New York, sitting by designation.

**COUNSEL**

George C. Boisseau and Dena Meierhenry (argued), Santa Rosa, California, for the defendant-appellant.

Benjamin B. Wagner, United States Attorney, and R. Steven Lapham (argued), Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

**OPINION**

WALLACE, Senior Circuit Judge:

Charles Lee White appeals from his conviction for conducting the affairs of an enterprise through a pattern of racketeering activity, conspiring to commit those acts, and committing violent crimes in aid of racketeering in violation of sections 1962(c) and (d), and 1959(a)(1) and (2) of title 18 of the United States Code. White contends that the district court erred when it failed to hold a competency hearing, *sua sponte*, to determine whether he was competent to stand trial. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

I

On January 29, 2003, White and eight co-defendants were indicted in the United States District Court for the Eastern District of California for conducting the affairs of an enterprise through a pattern of racketeering activity, conspiring to

do so, and with committing violent crimes in aid of racketeering activity. The charges against White involved his participation with the Pitch Dark Family, a criminal street gang operating on the west side of Vallejo, California. The indictment alleged five murders, an attempted murder, two instances of possession of cocaine base for sale, and one conspiracy to distribute illegal narcotics. White was alleged to have been personally involved in two of the murders and the conspiracy to distribute.

Between indictment and trial, several of White's co-defendants pleaded guilty and were sentenced. On October 28, 2005, the district court conducted a hearing pursuant to 18 U.S.C. § 4241 to determine whether White was competent to stand trial. The district court found reasonable cause to believe White was incompetent, remanded him to the custody of the Attorney General, and severed White from the trial of the two remaining defendants. The trial against White's co-defendants commenced on November 28, 2005, and both were convicted.

On May 15, 2006, White returned to the Eastern District of California from the Federal Medical Center at Butner, North Carolina. The doctors at Butner who evaluated White certified that he was competent to stand trial. On May 22, 2006, White's attorney, Jesse Rivera, informed the court that White would not speak to him and that White was adamant about the appointment of a new attorney. On May 30, 2006, the court appointed Michael Long to take Rivera's place as White's attorney.

On July 17, 2006, at a hearing on the issue of White's competence, Long advised the court that he agreed that White was competent. The district court then found that White was competent to go to trial and to assist his attorney in his defense. On September 11 the district court granted White's request to have a second attorney assist in his defense, and on September 29, appointed C. Emmett Mahle.

On March 1, 2007, at a hearing for trial confirmation and motions in limine, Long informed the district court that White wanted to disqualify his attorneys. The district court held a hearing with White and his two lawyers. White told the court that he was upset with Long because Long had forwarded information to him by giving it to a deputy rather than by mailing it. He also complained that the district judge had not given him an ex parte hearing when he appointed Long to replace Rivera. The district court denied White's request for appointment of a new attorney. White became extremely angry, asserted that the court did not adequately address his concerns, and had to be removed from the courtroom. During this hearing, Long informed the court that White had refused to meet with him since late July 2006.

The district court conducted a similar hearing on March 19, 2007, to discuss the problems between White and his attorneys. Long reported that White agreed to meet with him for a little over half an hour on January 4, 2007. Long said that he had attempted to meet with White 34 times since, but White had always refused. Long had also sent a number of letters to White, to which White had not responded. The district court again questioned White, inquiring why he believed Long could not represent him. White again raised the issue that he did not receive an ex parte hearing and that Long had passed information to him through a sheriff's deputy rather than through the mail. White informed the court that he would continue to refuse to talk with Long. As in the March 1 hearing, White became angry and disruptive, apparently because he felt the court was not responding to his questions, and had to be removed from the courtroom.

During the March 19, 2007 hearing, Long advised the court that he believed White was competent but that White was choosing not to cooperate. The district judge reviewed White's history of behavior in the courtroom and observed that this was his third request for new counsel on the eve of trial. The court concluded that White's reasons for wanting

new counsel were not adequate to justify substitution of counsel, but said that he was troubled by White's refusal to communicate with his attorneys. The district judge stated that each of White's previous attorneys had faced the same difficulty—that White refused to cooperate or talk to them. Ultimately, the district judge stated that even if he appointed new counsel, White would likely continue his pattern of noncooperation. The court concluded that Long and Mahle were able to represent White adequately even if he continued to refuse to cooperate and that the trial could go forward.

On April 2, 2007, the day before jury selection began, the district judge held another hearing with White and his lawyers. The judge asked whether White would remain silent during jury selection. White responded that he would say what he wanted to say. He then began to act out—yelling at his attorneys and shouting profanities. Later in that same proceeding, the judge held a closed hearing with Long and Mahle. During that closed hearing, Long informed the court that White said he would attempt to spit on counsel and that he had threatened that Long's car would be shot with armor-piercing ammunition.

Nevertheless, White attended jury selection without incident on April 3 and April 4, 2007, and was also present for the government's opening statement on April 9. The next day, during the defense's opening statement, White again exhibited anger when his attorney explained to the jury the meaning of the name of one of White's gangs, the Five Deuce Waterfront Crips. Long said that the gang was affiliated with the Crips, and that the name "Five Deuce Waterfront" came from the gang's territory, a five-block area near the Napa River waterfront in Vallejo. White interpreted this description apparently as disrespecting him and his "hood." White was removed from the courtroom while shouting profanities and threats at his attorneys. When White was brought back into the courtroom for the afternoon session, he lunged toward his attorneys and spit on them.

White interrupted the trial again on April 11, during the testimony of a witness, and the court ordered him removed from the courtroom. Thereafter, the judge regularly brought White into the courtroom, out of the presence of the jury, and asked whether he would refrain from disrupting the trial. White consistently refused to agree to do so and was removed from the courtroom.

On April 26, 2007, the district court held a closed hearing with defense counsel without White being present. In that hearing, counsel advised the court that White had made another threat to have Long killed and said that he could do it from the courtroom, from the prison, or even from heaven. Mahle advised the court that White tended to focus in on small things. As examples, Mahle referred to White's fixation on not having a hearing when Long was appointed, and a time when Long smiled and White thought Long was laughing at him. Long explained that White was angry with him for making certain objections and for other things. In particular, Long explained that White had insisted his attorneys secure a certain book that would outline his defense, but when he discovered that the book did not say what he thought it would, he stated that Long must have put the book on a computer, altered the language, and changed the cover as part of a conspiracy to get him convicted.

Later in the day, in another closed hearing, White was brought in and the court again asked whether he wanted to attend his trial. White again responded disrespectfully and was removed from the courtroom. At that time, counsel advised the court that White believed Long had been a special prosecutor in Alameda County in 2000 and 2002 and claimed to have videotapes of Long to prove it. Long opined that White "believes what he wants to believe." Trial Transcript at 1541. The court concluded the hearing by agreeing with Long: "I think the later phrase sums up Mr. White. He believes what he wants to believe. I haven't been able to get to Mr. White in five years. I'm not so sure any of us can." *Id.*

Throughout the course of the trial, the district judge had regular discussions with White to ask whether he would attend the trial and not disrupt the proceedings. White consistently refused to agree to remain quiet. During the twenty-five days of trial, White was able to remain in court without incident on only four days. On the other days, he either had to be removed or did not appear in the courtroom.

## II

**[1]** The district court must hold a hearing upon motion by either party or on its own motion "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Where there is reasonable cause to believe that the defendant is incompetent, a finding that the defendant is competent is a constitutional prerequisite to trial. *Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial"); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (the test for competency "must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him").

**[2]** When a trial court has not made an express finding of competence, "*Pate* [v. Robinson, 383 U.S. 375 (1966)] and *Drope* teach that appellate review of a failure to provide a hearing on competence to stand trial is comprehensive and not limited by either the abuse of discretion or clearly erroneous standard." *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc). A court must order a hearing *sua sponte*

if the evidence before it raises a "bona fide doubt" as to whether the defendant has become incompetent. *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010). The test for such a bona fide doubt is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *de Kaplany*, 540 F.2d at 983.

When a trial judge has held an initial competency hearing and has determined that the defendant is competent to stand trial, the decision whether to hold a second or subsequent competency hearing rests in the trial judge's sound discretion. *United States v. Clark*, 617 F.2d 180, 185 (9th Cir. 1980). We, therefore, review the district court's failure to order a second competency hearing *sua sponte* for abuse of discretion. *Id.* at 185 n.8.

White argues that our review should be de novo, rather than for an abuse of discretion, because the district court did not hold an evidentiary hearing when White returned from Butner. However, the record indicates that the district court did hold such a hearing on July 17, 2006. At this hearing the district court ruled,

> Since the parties are in agreement on [the defendant's competence] and based on the evidence that I have received, which includes the report from Butner, which I think very clearly sets forth the basis of their assessment as well as their conclusions and findings that the defendant is competent to stand trial, that will be the Court's finding with respect to the issue under [18 U.S.C. § ] 4241 that the defendant is competent to go to trial in this case and assist his attorney in his defense.

Transcript of Hearing at 2 (July 17, 2006). Because the district judge held a hearing and, based on the evidence before

him, found White to be competent, we review only his decision not to order a subsequent competency hearing and apply the abuse of discretion standard of review.

## III

**[3]** There are two required parts to our analysis in this appeal. The first deals with the defendant's ability to understand the nature and consequences of the proceeding, and the second, with the defendant's competency to assist in his defense.

## A

We first inquire whether sufficient evidence arose during the course of the proceedings against White to establish a bona fide doubt as to White's ability to understand the nature and consequences of the proceedings against him, such that the district judge abused his discretion in not holding a second competency hearing *sua sponte*. *See Clark*, 617 F.2d at 185.

**[4]** Here, the district court had substantial evidence that White had the ability to understand the nature and consequences of the proceedings against him. First, the court had the certification of competency from the doctors at Butner who had spent significant time with White and found him competent. This report recognized that White had trouble controlling his anger, but concluded that he understood the nature and consequences of the proceedings against him. The report states, "Mr. White knows the allegations against him and understands the significance of these charges, to include the possible penalties if convicted." Forensic Evaluation of Charles Lee White, Mental Health Dep't, Fed. Med. Ctr., Butner, N.C., at 10 (Completed Apr. 26, 2006). The report goes on to state, "In fact, Mr. White has expressed anger on several occasions because he believes he has not been afforded a speedy trial, which he recognizes as one of his constitutional rights." *Id.*

**[5]** The district judge had also received the opinion of White's attorney, Michael Long, who advised the court on March 19, 2007, that he believed White was competent to stand trial notwithstanding his angry outbursts and his refusal to communicate. During the closed hearing on whether White should receive new counsel and after White had made several disrespectful statements, Long told the district judge, "I agree with the state doctors and federal doctors, he is competent to go to trial. I feel he's choosing not to cooperate." Transcript of Hearing at 23 (Mar. 19, 2007). In a hearing on April 10, 2007, after White had been removed from the courtroom for disrupting his attorney's opening statements, Long told the court, "We know he's legally competent, but the records show he has some issue. One question is going to be: are his outbursts volitional, something that he can or cannot control? And those are questions I don't think any of us can really answer." Trial Transcript at 81. In other words, Long recognized that White might have an anger issue that impaired his ability to control his behavior, but did not believe that it impaired his ability to understand the proceedings against him. Long's opinion is certainly relevant to whether a trial judge must hold *sua sponte* another competency hearing. *Stanley v. Cullen*, 633 F.3d 852, 861 (9th Cir. 2011).

In addition, the district judge on several occasions interacted directly with White. On these occasions, White was able to respond to the questions the district judge asked. For example, when the judge asked White why he was displeased with Long's representation, White explained that it was because the district court had not given him an ex parte hearing when Long was substituted for his earlier lawyer and because Long used a sheriff's deputy to pass him information. White's reasons may not have been particularly reasonable, but he answered the question asked, suggesting that he at least had the ability to understand the question. These interactions weigh against a finding of a bona fide doubt whether White understood the proceedings against him.

However, the district judge also became aware of a report that may have indicated that White suffered from delusions. White's attorneys informed the district court that White believed Long had worked as a special prosecutor in Alameda County and that Long had modified a book that should have outlined White's defense as part of a conspiracy to get him convicted. On a number of occasions, White threatened to have both Long and the trial judge killed. In one of his outbursts White claimed he could have anyone in California killed. He said he could carry out his threats from prison, from the courtroom, and even from heaven. These alleged delusions, in connection with White's repeated inappropriate behavior, may suggest that White had some kind of mental problem—or they may not.

[6] Looking at this record from the perspective of the trial judge, we conclude that it was not an abuse of discretion not to hold *sua sponte* another competency hearing. The trial judge had significant evidence suggesting that White knew that he was on trial for serious crimes and that a potential consequence could be life imprisonment. In fact, he wanted to complete the trial. In one of White's outbursts, he exclaimed, "What you've got to do is keep me sequestered. Give me life. . . . Let's go to trial. Let's do this." Trial Transcript at 1539. Any disagreement White had with his attorneys and his possible inability to control his temper in the courtroom do not necessarily raise a bona fide doubt that he lacked the ability to understand the proceedings against him. This district judge had White and this case before him for over four years. White had appeared before this judge numerous times. The judge identified that White does "act out." This history is also important in determining whether the district judge abused his discretion.

B

Next, we consider whether the evidence before the district judge should have given the district court a bona fide doubt

as to whether White had the ability to assist in his defense, that is "to consult with his lawyer with a reasonable degree of rational understanding." *Dusky*, 362 U.S. at 402.

**[7]** In July 2006, when the district court declared White to be competent, the evidence strongly supported a finding that White had the ability to consult rationally with an attorney. The Butner report states,

> Mr. White is motivated and capable of assisting in planning his own defense. His current functioning is such that he could aid in challenging adverse witnesses, attend to courtroom procedures, and testify if necessary. . . . Any difficulties to which Mr. White may be susceptible in this arena are borne from his antisocial personality and his hostile feelings toward his counsel.

Forensic Evaluation of Charles Lee White, Mental Health Dep't, Fed. Med. Ctr., Butner, N.C., at 10 (Completed Apr. 26, 2006). Furthermore, in July White was actively cooperating with his new attorney, Michael Long. It was not until March 1, 2007, that the district judge learned of the problem Long was having with White.

**[8]** At that point, the district judge had very little evidence before him to determine why White was refusing to cooperate with his lawyer. A reasonable judge might well have found that White had a mental issue that prevented him from maintaining a stable relationship with any attorney. But it would have been just as reasonable for the district judge to infer that White had the ability to cooperate with an attorney, but had decided not to, that is, he was purposely causing the problem for his own reasons. The district judge questioned White about why he would not cooperate with his attorneys and White explained that it was because Long had used a sheriff's deputy to pass him information rather than sending it through the regular mail. But the attorney charged with White's

defense told the court that he believed White was choosing not to cooperate. That is, the lawyer professionally charged with providing the best defense he can as an officer of the court did not request a second competency hearing but rather gave his opinion, based on his observations of White, that White was making a voluntary choice to disrupt the trial proceedings.

**[9]** With this evidence before it, there was no abuse of discretion when the district court did not hold another competency hearing. A reasonable judge could have, in his sound discretion, found that White had the *ability* to assist in his defense if he chose to do so, but was choosing not to cooperate with his attorneys. Even without an express finding of fact that White was choosing not to cooperate with his lawyers, the evidence before the district court would not necessarily provide a reasonable judge with a bona fide doubt as to whether White lacked the ability to do so.

In sum, the district judge did not abuse his discretion in not holding a second competency hearing *sua sponte*. Based on the evidence before the district judge, including more than four years' experience with White, a reasonable judge in the district judge's position would not necessarily have entertained a bona fide doubt as to whether White had the ability to understand the nature and object of the proceedings against him and had the ability to assist in his defense. Therefore, the decision not to order a second competency hearing was within the district court's sound discretion, and that discretion was not abused.

**AFFIRMED.**