CALLAHAN, Circuit Judge,
dissenting:
I respectfully dissent. I cannot agree that it was plain error for the district court not to sua sponte order a competency hearing after Joel Dreyer pleaded guilty and received the benefit of his plea agreement but before sentencing. Dreyer was represented by competent counsel and had been examined by a number of doctors. Although all agreed that he suffered from frontotemporal dementia (“FTD”), none opined that Dreyer was not competent to participate in his sentencing. Moreover, although Dreyer chose not to allocute, he was responsive when the district judge addressed him personally, stating that he respected the judge and appreciated her comments. Even if the trial judge might have issued a sua sponte order for further psychiatric and medical evaluations, failure to do so was not plain error. Moreover, *815 the majority’s unrequested reassignment of the case on remand to another judge is contrary to our norm of remanding to the original sentencing judge and is unsupported in fact or law.
I do not question the majority’s genuine doubt regarding Dreyer’s competence. However, this does not allow it to substitute its opinion for what a reasonable judge would be expected to experience. Cf. Chavez v. United States, 656 F.2d 512, 515-16 (9th Cir.1981) (overruled on other grounds). The rule reflects the fact that appellate judges viewing the cold record are not in as good a position to evaluate a defendant’s competence as the district court judge who has interacted with the defendant over the course of many hearings. The majority thus does exactly what we said we could not do in Chavez: it disguises its own doubts about Dreyer’s competence as what “a reasonable judge would be expected to experience.” See id. The record does not show that a reasonable judge would have experienced a “genuine doubt respecting [Dreyer’s] competence,” see id., or that the district judge would not or could not fairly evaluate Dreyer’s competence on remand.
I. Background
Between May of 2004 and July of 2007, Dreyer conspired with his co-defendant to distribute oxycodone, an addictive Schedule II controlled substance, dispensing over 20,000 pills over the course of approximately three years. Additionally, Dreyer unlawfully distributed another 17,746 oxycodone pills and 78,923 hydrocodone pills independent of his codefendant. One of Dreyer’s patients was Jessica Tia Silva, who died of an overdose of Dreyer’s prescriptions to her. Another patient was 17-year-old Jeremy Brink, who Dreyer knew was a minor and without parental consent for treatment. Nevertheless Dreyer altered the patient’s age on prescriptions for Norco and Xanax. Dreyer prescribed these patients and many others lethal quantities of addictive drugs without conducting physical examinations of the patients or taking their medical histories and received $100-$200 for each prescription. On September 21, 2009, Dreyer pleaded guilty pursuant to a plea agreement, to two counts: (1) conspiracy to possess with the intent to distribute oxycodone and to distribute oxycodone; and (2) unlawful distribution and dispensing of oxycodone.
After Dreyer pleaded guilty but before his sentencing hearing, he underwent several medical and psychological evaluations by four experts. Dr. Daniel G. Amen and Dr. Christine D. Krause prepared a June 1, 2010 report (the “Amen/Krause Report”) detailing their findings from their evaluations of Dreyer. Dr. Amen and Dr. Krause were retained by the defense. Dr. Amen performed a scan of Dreyer’s brain, and Dr. Krause (a neuroclinical psychologist) performed a forensic evaluation of Dreyer. The Amen/Krause report concluded that Dreyer “manifests symptoms of early Frontotemporal Dementia which has caused him to engage in activities that he may not have clearly understood such as in the plea agreement. He has also exhibited poor judgment in several incidences over the past few years that were not typical of his behavior prior to his medical emergency.” The report also explained that patients suffering from FTD commonly have “executive function and reasoning deficits.”
On August 9-10, 2010, Dr. Daniel A. Martell (“Dr. Martell”), a forensic psychologist, also evaluated Dreyer and prepared a report (the “Martell Report”). The purpose of this evaluation was to determine whether any impairment: (1) affected Dreyer’s competence to plead guilty; (2) affected Dreyer’s mental state during the offenses; or (3) will affect Dreyer’s adjustment or put him at risk in prison. Dr. *816 Martell agreed that Dreyer had FTD, as “characterized by the cluster of symptoms exhibited by Dr. Dreyer, including: behavioral disinhibition, frontal lobe cognitive dysfunction, memory impairment, loss of smell (anosmia), impaired word-finding ability (dysnomia), hypersexuality, loss of tact and social propriety, and lack of insight into his own impairments (anosagnosia).” Dr. Martell opined that “[t]his is not to say, however, that his condition caused him to be unaware of the nature and consequences of his behavior, or that what he was doing was wrong. Rather it may mitigate or reduce his culpability in the eyes of the court as his moral compass was effectively compromised by brain damage over which he had impaired control.” Significantly, despite his conclusions about Dreyer’s FTD, Dr. Martell also opined that Dreyer’s guilty plea was knowing, intelligent, and voluntary. Dr. Martell concluded that Dreyer was “indeed competent to plead guilty.”
On November 20, 2010, Dreyer was evaluated by Dr. F. David Rudnick (“Dr. Rudnick”), a psychiatrist specializing in neurobehavior. Dr. Rudnick reviewed the other two medical reports and then conducted his own clinical tests of Dreyer. Id. Dr. Rudnick’s report (the “Rudnick Report”) also concluded that Dreyer exhibited symptoms of FTD. Dr. Rudnick opined that Dreyer’s “dementia prevented him from accurately critiquing or monitoring his own behavior and from foreseeing its consequences. He was truly convinced that his actions did not constitute professional violations.” However, Dr. Rudnick also stated that, with minor exceptions, Dreyer’s “cognitive skills were intact.”
II. Sentencing Hearing
On December 18, 2010, over fourteen months after Dreyer pleaded guilty, the district court conducted Dreyer’s sentencing hearing. During the sentencing hearing, the district court judge stated that she had read all of the medical reports and the defense’s memoranda about Dreyer’s medical condition. Dreyer did not ask for- a competency hearing but instead requested leniency in sentencing due to his medical condition. Nonetheless, the court explained that the evidence did not indicate that Dreyer was incompetent to be sentenced:
There’s a great deal of medical evidence that’s been submitted to the Court about the defendant’s medical condition, reports of which, not all of which is really substantiated. The self-reporting by the defendant is not always substantiated by the medical records. That is, the self-reported flat-lining and cardiac arrest. ...
[A]t the time of the arrest, which is, of course, very close in time to the conduct in question, the defendant spoke for hours to the agents. He was lucid, more than lucid, very articulate, cunning; and he lied to the detectives, the agents, over and over. He wasn’t forgetful. So he may well have deteriorated since that time, and there’s been medical evidence submitted to the Court about his current condition, but that is not necessarily a reason for him not to be sentenced now. And a reasonable sentence would include a period of incarceration.
The court further explained that:
The defense relied heavily on the statements contained in the medical reports of Dr. Martell and Dr. Rudnick that he needs further treatment. I agree with that, and I believe he should be placed in [a Federal Medical Center], but that does not mean he should not receive a prison term.
The court then sentenced Dreyer to 120 months’ imprisonment — the low end of the guidelines range — and three years of supervised release.
*817 III. Standard of Review
“On review, [the] inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether [the Court of Appeals] would find the defendant incompetent if [it] were deciding the matter de novo. Rather, [the Court of Appeals] reviews the record to see if the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant’s competence.” See Chavez, 656 F.2d at 515-16 (overruled on other grounds). A defendant is competent to stand trial and be sentenced if he has both a “sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him.” United States v. Fernandez, 388 F.3d 1199, 1251 (9th Cir.2004). A district court’s failure to sua sponte order a competency evaluation is only error if the evidence of incompetence is such that a reasonable judge would have a genuine doubt about the defendant’s ability to rationally communicate with his attorney and understand the proceedings. United States v. Marks, 530 F.3d 799, 814 (9th Cir.2008). The factors this Court considers to determine whether there was sufficient evidence of incompetence are “the defendant’s irrational behavior, his demeanor in court, and any prior medical opinions on his competence.” Id.; see also United States v. White, 670 F.3d 1077, 1082 (9th Cir.2012) (taking into consideration the trial judge’s observation of the defendant over the course of the proceedings).
Importantly, “[w]here, as here, the issue is raised for the first time on appeal, we review a district court’s decision not to sua sponte order a competency hearing for plain error.” See Marks, 530 F.3d at 814 (citing Fernandez, 388 F.3d at 1250-51). “Plain error is ‘(1) error, (2) that is plain, and (3) that affect[s] substantial rights.’ ” Id. (alterations in original) (quoting United States v. Thornton, 511 F.3d 1221, 1225 n. 2 (9th Cir.2008)). “If these conditions are met, an appellate court may exercise its discretion to correct the error ‘only if (4) the error seriously affeet[s] the fairness, integrity, or public reputation of judicial proceedings.’ ” Thornton, 511 F.3d at 1225 n. 2 (quoting Johnson v. United States, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).
IV. Analysis
The district court did not err in failing to sua sponte order that Dreyer be evaluated for competency prior to imposing the sentence. A critical feature of this case, and one that distinguishes it from the cases relied upon by the majority, is that Dreyer is only claiming that he was not competent to be sentenced. He does not allege that he was incompetent to be tried or to plead guilty. Moreover, he admits that he “did not manifest any observable signs of incompetency during the sentencing hearing.” Rather, he argues for the first time on appeal that medical reports he sought — after he entered a plea agreement but before he was sentenced — required that the district court sua sponte order a competency hearing, even though he never requested a competency hearing. A fair review of the record shows that there was no plain error and that even if there were error, it did not “seriously affect the fairness, integrity, or public reputation of judicial proceedings.” Cf. Thornton, 511 F.3d at 1225 n. 2.
A. Dreyer’s Medical Evaluations Were Not Conclusive.
Dreyer’s medical evaluations indicate that while he suffers from FTD and has some related mental deficiencies, these deficiencies do not rise to the level of the *818 legal standard of incompetence. One of the doctors expressly concluded that Dreyer was competent and another concluded that his “cognitive skills were intact.” Dreyer does not attempt to demonstrate that his FTD prevented him from rationally conferring with his counsel or understanding the proceedings, which is the definition of legal incompetence. He does not explain how his diagnosis relates to this standard of incompetence, but instead makes the misleading inference that impaired judgment and degenerative brain damage is equivalent to legal incompetence. In doing so, he conflates medical standards with the applicable legal standard of incompetence. Dreyer’s medical records and behavior do not suggest that he had difficulty rationally conferring with his counsel and rationally understanding the proceedings. Instead, the record shows that he interacted with his attorneys and the court thoughtfully and even drafted a document titled “Brain Damage” during the presentence investigation, writing “[t]his is sad that I have a brain lesion of my frontal lobe but it could very well be the thing that keeps me out of federal prison.” It appears that Dreyer rationally understood the nature of the proceedings against him and his attorney’s strategy for seeking a reduced sentence.
Case law indicates that it is not sufficient to point out that a defendant has a medical ailment causing decreased brain function. Rather, the evidence must also reasonably indicate that the ailment prevented the defendant from rationally interacting with his attorney and understanding the sentencing proceedings. See Marks, 530 F.3d at 814; Fernandez, 388 F.3d at 1251. There is no such evidence of this kind of causal relationship here. Dr. Mar-tell expressly reported that his findings regarding Dreyer’s FTD did not indicate that “his condition caused him to be unaware of the nature and consequences of his behavior, or that what he was doing was wrong.” Dr. Martell further opined that Dreyer’s guilty plea was knowing, intelligent, and voluntary. Another doctor, Dr. Rudnick, reported that with minor exceptions, Dreyer still has functional cognitive skills. The district court had before it three medical examinations by four medical doctors, none of which indicated that Dreyer was legally incompetent.
B. Dreyer Did Not Exhibit Signs of Incompetence in Court.
The district court, having observed Dreyer’s conduct over the course of multiple hearings, reasonably thought he was competent. Dreyer himself admits that he “did not manifest any observable signs of incompetency during the sentencing hearing.” There is nothing in the record indicating that Dreyer exhibited signs of incompetency or unusual behavior in court. Moreover, Dreyer’s attorney who had extensive off-the-record interactions with Dreyer never indicated that he was incompetent. This is significant because the district court judge was entitled to expect that if there was a serious question as to Dreyer’s competence, his attorney would raise the issue. Attorneys are the primary gatekeepers and have an affirmative duty to investigate their client’s mental state “if there is evidence to suggest that the defendant is impaired.” See Douglas v. Woodford, 316 F.3d 1079, 1085 (9th Cir. 2003).
The majority makes much of the fact that Dreyer chose not to allocute. See Maj. Op. at 809-11. Dreyer’s attorney stated that he would not allocute because he might contradict himself or “speak inappropriately,” and the majority suggests that this should have signaled Dreyer’s incompetence to the district court judge. However, the record supports other possible explanations for Dreyer’s silence. At the sentencing hearing, the judge noted *819 that Dreyer had lied to the detectives “over and over.” Accordingly, Dreyer may have declined to speak to avoid having to explain his prior falsehoods and avoid the risk of uttering additional falsehoods.
In any case, there is no ease law indicating that a decision not to allocute necessarily means that a defendant is incompetent to participate in his own sentencing hearing. A defendant may decline allocution for strategic reasons as well as for reasons related to a disability, mental health issues, or a host of behavioral concerns that do not rise to the level of incompetence. Since many criminal defendants do not enjoy perfect mental health or behave within social norms, the majority cannot mean that every time a defendant represented by counsel has a history of mental health and/or behavioral issues and chooses not to allocute, a court has a sua sponte duty to order a competency hearing. A decision not to allocute may be a factor in evaluating whether the trial court should have “experienced a genuine doubt respecting the defendant’s competence,” but without clearer evidence of incompetency in the medical records or unusual behavior in court, it is not enough. Cf. Chavez, 656 F.2d at 515-16.
C. The Majority Relies On Factually Distinguishable Cases.
The cases cited by the majority do not support granting relief because: (1) they concern claims of incompetence to stand trial — not incompetence to be sentenced; (2) most concern pro se defendants — not defendants represented by counsel; and (3) all involved substantial histories of psychosis and/or severe brain damage — considerably more than is present in this case. See, e.g., Pate v. Robinson, 383 U.S. 375, 385-86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (defendant had a brick dropped on his head, walked around in a daze, and defendant’s mother stated that he had “lost his mind”); Torres v. Prunty, 223 F.3d 1103, 1104-06 (9th Cir.2000) (defendant was diagnosed with a severe delusional disorder, had extensive brain damage from head trauma, and had uncontrollable outbursts in court); Odle v. Woodford, 238 F.3d 1084, 1088-90 (9th Cir.2001) (defendant suffered from hallucinations, was committed to a psychiatric ward at least four times, and had a temporal lobectomy removing a 3 x 3 x 4 inch piece of his brain).
In asserting that his medical evaluations evidence his incompetence, Dreyer relies extensively on Odie. The facts in Odie were very different. Odie claimed he was incompetent to stand trial because: (1) he had a lengthy medical history demonstrating severe mental health issues; (2) there was witness testimony indicating severe mental impairment, hallucinations, and multiple commitments to a psychiatric ward; and (3) he was “missing a piece of his brain the size of a grape-fruit.” Id. at 1088-90. Consequently, we held that there was substantial evidence of incompetence and the trial court should have ordered a competency evaluation sua sponte. Id. The Court reasoned that “[wjhere a petitioner has suffered massive trauma to his brain and subsequently exhibits psychotic behavior, some of it while awaiting trial, an inquiry into whether he possesses the mental acuity to participate in the proceedings is the reasonable and appropriate course of action.” Id. at 1089.
Unfortunately, Dreyer does have brain damage, but that is where the similarities between his case and the Odie case end. Likewise, the other cases that Dreyer relies on are distinguishable. In Morris v. United States, 414 F.2d 258, 258-59 (9th Cir.1969), Morris challenged his conviction and sentence based on evidence that he had a history of severe mental illness and multiple documented periods of psychosis. *820 The medical record in Dreyer’s case does not contain the indicia of incompetence as present in Odie and Morris. On the contrary, Dr. Martell opined that Dreyer was competent to plead guilty, and Dr. Rudniek found that Dreyer’s cognitive skills were intact.
Moreover, the majority’s seminal case, United States v. Duncan, 643 F.3d 1242 (9th Cir.2011), does not support its opinion for several reasons. First, Duncan involved the defendant’s competence to represent himself during the penalty phase hearing and to waive his own right to appeal. Duncan, 643 F.3d at 1248-49. Indeed, defense counsel had moved for a competency hearing and the trial court denied the motion and allowed Duncan to proceed without counsel. Id. at 1242-48. We accordingly first held that standby counsel could appeal (against Duncan’s wishes), and then we determined that Duncan was not competent to waive both his right to counsel and his right to appeal. Id. at 1244-49. Second, in Duncan, there was considerably more evidence of incompetence than is present in Dreyer’s case. In Duncan:
Standby counsel produced reports from three experts, all well established and highly regarded in the field of neuropsychiatry, who had examined Defendant personally and had found him to suffer from — in the words of one of the experts — “delusional beliefs, paranoia, grandiosity, and psychotic breaks with reality.” AH three experts formed the same opinion that — in the words of another of the experts — Defendant’s “mental diseases and defects render him incapable of rationally understanding and participating in the proceedings, and therefore incompetent.”
Id. at 1249.
In contrast to the facts in Duncan, none of the doctors who examined Dreyer intimated that he was “incapable of rationally understanding and participating” in the sentencing proceedings. Dr. Martell opined that Dreyer’s guilty plea was knowing, intelligent, and voluntary. Another doctor, Dr. Rudnick, reported that with minor exceptions, Dreyer’s “cognitive skills were intact.” Dr. Amen and Dr. Krause concluded that Dreyer “manifests symptoms of early Frontotemporal Dementia [“FTD”] which has caused him to engage in activities that he may not have clearly understood” and that Dreyer “exhibited poor judgment in several incidences.” However, that report did not make any express finding regarding Dreyer’s competence as three experts did in the Duncan case. Duncan is thus distinguishable on its facts, its procedural posture, and its standard of review.
D. A Finding of Plain Error is Inconsistent with Our Prior Cases.
■■ When the record indicates that the defendant has a medical or mental health condition that may affect the brain but does not interfere with the defendant’s ability to rationally consult with his attorney and understand the proceedings, this Court has not found sufficient evidence of incompetence. See, e.g., White, 670 F.3d at 1081-85 (defendant’s angry outbursts in court and report indicating that White may have suffered from delusions was not substantial evidence of incompetence); Davis v. Woodford, 384 F.3d 628, 646-47 (9th Cir.2004) (defendant’s depression and irrational conduct during trial was not substantial evidence of incompetence); United States v. Mendez-Sanchez, 563 F.3d 935, 939-40 (9th Cir.2009) (defendant’s irrational behavior and difficulties communicating with his lawyer was not substantial evidence of incompetence).
Most recently in White, we found that the district court did not err in fading to hold a sua sponte competency hearing in a case where the defendant lashed out in the courtroom, shouting obscenities and *821 threats, spitting, and generally disrupting the proceedings. White, 670 F.3d at 1081. White’s behavior was so uncontrollable that “[d]uring the twenty-five days of trial, White was able to remain in court without incident on only four days. On the other days, he either had to be removed or did not appear in the courtroom.” Id. At some point during the trial, the court also received a report that White may have suffered from delusions. Id. at 1084. However, while recognizing that “[t]hese alleged delusions, in connection with White’s repeated inappropriate behavior, may suggest that White had some kind of mental problem — or they may not,” we concluded that the district court had not erred in failing to hold a sua sponte competency hearing because “[t]he trial judge had significant evidence suggesting that White knew that he was on trial for serious crimes and that a potential consequence could be life imprisonment.” Id.
Dreyer is not entitled to any relief under White’s analysis.[1] In fact, there is even less evidence of incompetence here than in White. There were no outbursts and Dreyer was able to acknowledge his rights and ask questions during the sentencing hearing. Dreyer was also able to participate respectfully and appropriately. Id. Additionally, the doctors’ reports did not undermine the district court’s determination — based on its experience with Dreyer and his demeanor — that Dreyer was competent to be sentenced. Dreyer is suffering from the early stages of FTD, and while the medical record indicates that he may have impaired judgment and lowered inhibitions, there is no indication in any of the three medical reports that he did not understand the proceedings against him and could not adequately participate in his own defense. See Fernandez, 388 F.3d at 1251.
E. Any Error Did Not Affect the Fairness, Integrity, or Public Reputation of the Judicial System.
Even if the district court erred in proceeding to sentence Dreyer (which it did not), under Marks, Dreyer would only be entitled to relief if the error “seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.” See Marks, 530 F.3d at 814 (quoting Thornton, 511 F.3d at 1225 n. 2). Dreyer fails to demonstrate that there is any error rising to this level. Here, Dreyer was represented by counsel, who having obtained medical evaluations of Dreyer after he pleaded guilty, did not alert the court that Dreyer was incompetent to be sentenced. Cf. Douglas, 316 F.3d at 1085 (finding that attorneys have a duty to request a competency hearing “if there is evidence to suggest that the defendant is impaired”). *822 Therefore, Dreyer’s attorney’s failure to do so was a strategic choice based on his belief in his client’s competence. Dreyer’s attorney only referenced these medical reports to seek leniency in sentencing. In this context, the fairness, integrity, and public reputation of the judicial proceedings would not be blemished by the Court’s denial of relief based on an issue raised by counsel for the first time on appeal.
F. Any Error Does Not Warrant Remand to a Different Judge
Finally, I dissent from the majority taking it upon itself to remand this case to a different district judge when Dreyer did not request such action. Cf. Maj. Op. at 813-14. Resentencing is normally performed by the same district court judge who originally sentenced the defendant. See United States v. Mikaelian, 168 F.3d 380, 387-88 (9th Cir.1999). We only remand for resentencing to a different judge in “unusual circumstances,” and this case does not present such circumstances. Id.
The fact that a judge did not sua sponte order a competency hearing after a represented defendant pleaded guilty cannot constitute an “unusual circumstance.” Otherwise, every challenge to a failure by the district court to act sua sponte would constitute an “unusual circumstance.” Moreover, as noted, Dreyer does not challenge his competence to have pleaded guilty, and admits that he “did not manifest any observable signs of incompetency during the sentencing hearing.”
In Mikaelian, we noted that although “resentencing would normally be performed by the same district judge who originally sentenced the defendant,” in unusual circumstances, resentencing before a different judge may be appropriate based on the consideration of three factors:
(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.
168 F.3d at 387-88 (citations and quotations omitted).
The record indicates that the district court judge can and will fairly evaluate Dreyer’s mental competence. First, it should be noted that the remand is not initially directed to the district court judge’s discretion. Rather, the district court is directed to conduct a further competency hearing. Presumably, at such a hearing the parties will submit additional evidence. Second, the district court judge has already indicated her sensitivity to Dreyer’s medical condition. At the sentencing hearing, she commented that “[t]he defense relied heavily on the statements contained in the medical reports of Dr. Martell and Dr. Rudnick that he needs further treatment. I agree with that, and I believe he should be placed in [a Federal Medical Center].” She then sentenced Dreyer to the lower end of the Guidelines range.
The majority points to the fact that, during the hearing on the motion for bail pending appeal, the district court commented on Dreyer’s competence. This was appropriate because the motion for bail pending appeal involved an evaluation of the likelihood of success on the merits of the pending appeal. In particular, Dreyer had indicated that he would challenge the failure to sua sponte order a further competency hearing in his appeal. Moreover, the judge’s comments were based on materials that were properly before her and were moderate in tone. The court summa *823 rized its impressions of Dreyer at the sentencing hearing as follows:
He acknowledged his right to allocute. He acknowledged his appeal rights. He consulted with his lawyer quietly and respectfully at several points during the sentencing, and it’s my recollection that he did that in particular during the points when the victim, the young woman who had died as a result of an overdose of the prescription drugs which Mr. Dreyer prescribed, when her twin brother spoke____When in open court, the twin brother was speaking, [Dreyer’s] affect showed complete comprehension and, frankly, showed some anger rather than compassion towards the family member, but there was no evidence of lack of competence.
Thus, a review of the record offers no sound ground for questioning the district court’s objectivity with regard to Dreyer, even assuming that the judge somehow erred in not sua sponte ordering a further competency hearing.
The majority’s assertion that the “district judge indicate[d] that she has already determined without the benefit of a hearing ... that Dreyer is competent and that a full evidentiary hearing is unnecessary,” flips the standard on its head. Cf. Maj. Op. at 814. The observation is necessarily true in all cases involving failures to sua sponte order competency hearings. By definition a judge who does not sua sponte order a competency hearing must have “already determined without the benefit of a hearing” that the defendant is competent. Otherwise, the judge would have had a reasonable doubt about competence and ordered a competency hearing. The majority’s reasoning is circular.
The second factor — “whether reassignment is advisable to preserve the appearance of justice,” Mikaelian, 168 F.8d at 387 — does not support the majority’s reassignment. As noted, the district court treated Dreyer respectfully, Dreyer participated in the proceedings in an appropriate manner, and at sentencing Dreyer even expressed his appreciation for the district court judge, stating “I respect you” and “I appreciate your comments.” In this situation, it is this court’s unrequested — and unnecessary-reassignment that compromises the appearance of justice, as it may well be read as encouraging a defendant to belatedly claim that the district court judge should have acted sua sponte in the hope of thereby obtaining a different judge on remand (should the defendant prevail on appeal). This portion of the majority’s opinion could also be viewed as an appellate court expressing an opinion — without the benefit of further medical evaluations and a hearing — that Dreyer is in fact incompetent and that the judge that is reassigned for sentencing is expected to find Dreyer incompetent. This does not promote the “appearance of justice.” Cf. Mikaelian, 168 F.3d at 387.
Last, the third factor weighs heavily against reassignment. The district judge has considerable experience with Dreyer and his counsel. This is particularly important in light of Dreyer’s abilities. His own counsel reportedly stated that “[pitting him in a prison will mess up the facility because Dr. Dreyer, based on this injury he has, will try to reorganize the facility” and “[h]e will be running the place really because he is so intelligent and he is so cunning and manipulative.”[2] Accord *824 ingly, reassignment would entail waste and duplication by forcing a new judge to familiarize himself or herself with a defendant who has the ability to try to manipulate the system, if he has not already done so.
Although each case is unique, the circumstances of this case are not particularly unusual and do not meet the standard for reassignment on remand set forth in Mikaelian, 168 F.3d at 387-88. There is no evidence in the record suggesting that “the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views,” or that reassignment is “advisable to preserve the appearance of justice,” or that the reassignment would not “entail waste and duplication.” Id.
In my view, the majority overreaches not only in faulting the district court judge for not making a sua sponte order but also in then finding that she cannot be fair on remand in a case where the issue of Dreyer’s competence was raised for the first time on appeal. The majority’s approach will have a chilling effect on district court judges who are always required to determine a defendant’s competence in the first instance. Respect for this task requires that we defer to their reasonable judgments. Our usual course of remanding for resentencing to the judge who originally sentenced a defendant should be followed unless there is clear objective evidence that the district court judge would have difficulty putting aside her previously expressed views. Because there is no such evidence in this case, we should presume that the original sentencing district court judge is able to perform her duties normally on resentencing.
V. Conclusion
The district court reasonably concluded that Dreyer was competent to be sentenced, and even if she was mistaken, there is no good reason to find that she is incapable of resentencing Dreyer in accordance with the majority’s instructions on remand. Accordingly, I dissent from the majority’s opinion. First, although Dreyer’s medical evaluations indicate that he suffers from FTD and has some related mental deficiencies, none of the reports indicate that these deficiencies interfered with his ability to consult with his lawyer or to understand the proceedings against him. Second, although Dreyer chose not to allocute, neither the records nor the district court’s observations of Dreyer’s behavior in the court-room indicate that he was incompetent to be sentenced. Third, none of the cases cited by the majority support granting relief to a represented defendant who behaves normally in court and has no compelling evidence of incompetence. Fourth, granting Dreyer relief is inconsistent with out recent opinion in White, directing deference to the trial judge’s judgment. Fifth, even if the district court did err, the error does not seriously affect the fairness, integrity, or reputation of the judicial proceedings. Last, but not least, even if the district court did err, there are insufficient grounds for departing from our normal practice of remanding to the original sentencing judge for resentencing. Dreyer did not request such relief, and the majority’s sua sponte direction is not supported by the facts or the law. The majority improperly substitutes its evaluation of Dreyer, based on a cold and inconclusive record, for the trial judge’s determination that was based not only on the medical record but on Dreyer’s conduct in court. Because the district court did not err in *825 sentencing Dreyer without sua sponte ordering a competency hearing, I would affirm.

. The majority cites White for the proposition that "we must conduct, as White reaffirms, a ‘comprehensive [review] not limited by either the abuse of discretion or clearly erroneous standard.’ ” Maj. Op. at 811-12, n. 3. Unlike the situation in White, where White’s competence was repeatedly questioned in the trial court and White’s multiple outbursts interrupted the trial, here Dreyer’s competence to be sentenced is raised for the first time on appeal. Thus, White is not contrary to our decisions providing that where "the issue is raised for the first time on appeal, we review a district court's decision not to sua sponte order a competency hearing for plain error.” See Marks, 530 F.3d at 814 (citing Fernandez, 388 F.3d at 1250-51). Moreover, that White involved a defendant who had already had one competency hearing is a distinction without a difference since competency is an ongoing question and should be evaluated at every stage of the proceedings. What is relevant in White is its factual analysis of the trial judge’s observations of the defendant's behavior in the courtroom in combination with the reports about the defendant’s mental health. White, 670 F.3d at 1081-84. Here, Dreyer’s reasonable behavior in the court was consistent with the medical reports indicating that he was competent to be sentenced.

. The majority objects that the district court judge misstated defense counsel’s representations. However, there is considerable evidence in the record that Dreyer is intelligent, cunning, and manipulative. Accordingly, even if the district court judge did misinterpret defense counsel’s statement about Dreyer reorganizing the prison facility, such a mis *824 take does not indicate that the judge could not fairly resentence Dreyer.