**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JOEL STANLEY DREYER,
*Defendant-Appellant*.

No. 10-50631

D.C. No.
5:08-cr-00041-VAP-1

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
February 8, 2012—Pasadena, California

Filed January 7, 2013

Before: Stephen Reinhardt, Kim McLane Wardlaw,
and Consuelo M. Callahan, Circuit Judges.

Order;
Dissent to Order by Judge Tallman;
Opinion by Judge Reinhardt;
Dissent by Judge Callahan

# SUMMARY[*]

## Criminal Law

The panel issued an order (1) withdrawing an opinion and dissent filed October 12, 2012; (2) filing a superseding opinion and dissent; (3) stating that a vote on a judge's sua sponte request to rehear the matter en banc failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration; and (4) directing the clerk to issue the mandate forthwith.

In the superseding opinion, the panel vacated a sentence and remanded for the district court to evaluate the defendant's competency on the basis of an evidentiary hearing. The panel held that the record before the district court at sentencing was sufficient to cause a genuine doubt as to the defendant's competency and that the district court committed plain error by failing to order a hearing sua sponte.

In the superseding dissent, Judge Callahan wrote that she could not agree that it was plain error for the district court not to sua sponte order a competency hearing after the defendant pleaded guilty and received the benefit of his plea agreement but before sentencing.

Dissenting from the denial of rehearing en banc, Judge Tallman (joined by Chief Judge Kozinski and Judges O'Scannlain, Bybee, Callahan, Bea, Ikuta, and N.R. Smith)

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

wrote that by failing to take the case en banc, this court has made a hash of the plain error standard, and that the majority's decision will wreak havoc on sentencing proceedings.

## COUNSEL

Pamela O'Leary Tower (argued), Kenwood, California; Roger J. Rosen, Los Angeles, California, for Appellant.

Antoine F. Raphael (argued), Assistant United States Attorney; Andre Birotte Jr., United States Attorney, Riverside, California for Appellee.

## ORDER

The opinion and dissent filed August 21, 2012 are withdrawn. A superseding opinion and dissent was circulated to the Court on October 12, 2012 and is being filed concurrently with this order.

After the superseding opinion and dissent was circulated, a judge sua sponte requested a vote on whether to rehear the matter en banc. Although no petition for rehearing or petition for rehearing en banc was filed, the parties were given notice of the superseding opinion and dissent and permitted the opportunity to state their positions on whether the matter should be reheard en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. FED. R. APP. P. 35.

No future petition for rehearing or petition for rehearing en banc will be entertained. **The clerk is directed to issue the mandate forthwith.**

Judge Callahan would have the mandate issue after seven days as generally provided by Federal Rule of Appellate Procedure 41(b).

---

TALLMAN, Circuit Judge, joined by KOZINSKI, Chief Judge, and O'SCANNLAIN, BYBEE, CALLAHAN, BEA, IKUTA, and N.R. SMITH, Circuit Judges, dissenting from the denial of rehearing en banc:

By failing to take this case en banc we have made a hash of the plain error standard. Under the guise of a plain error review, the majority has conducted a de novo analysis, concluding that the district court plainly erred by not *sua sponte* ordering a competency hearing prior to sentencing. The majority's decision is not only irreconcilable with our prior precedents, it also will wreak havoc on sentencing proceedings. In the wake of this decision, district judges may feel compelled to order a competency hearing any time a defendant suffers from a medical condition and, as a result, cannot "expres[s] himself appropriately or in a manner that could assist in his defense." *United States v. Dreyer*, 693 F.3d 803, 813 (9th Cir. 2012).

Federal courts nationwide pronounced 86,000 sentences in 2011; 21,000 of these sentences were pronounced in the Ninth Circuit alone. United States Sentencing Commission, *Statistical Information Packet* 3 tbl. 2 (2011). Defendants

with medical and psychological deficiencies that prevent or impair their ability to allocate are not infrequently sentenced, and district courts, quite properly, do not routinely conclude that such impairments rise to the level of legal incompetence. The *Dreyer* opinion affords no deference to district courts, which are uniquely qualified to evaluate competency at sentencing, and will only result in unnecessary and expensive evaluations, hearings, resentencings, and remands when evidence of legal incompetence is limited or absent.

To justify its conclusion, the majority relies on a distorted interpretation of the facts and a tortured construction of existing precedent. The majority finds plain error even though three doctors opined that Dreyer was competent to plead guilty, *and* even though no evidence suggested that Dreyer's mental condition had deteriorated after he was last found competent, *and* even though neither party suggested a need for a competency evaluation prior to sentencing, *and* even though Dreyer's behavior in court did not suggest the need for further evaluation. In vacating Dreyer's sentence, the majority has improperly substituted its judgment for that of the district court, resulting in an opinion that will undermine the finality of any number of properly imposed sentences.

## I

The record does not support the majority's ruling that the district court's failure to *sua sponte* conduct a competency hearing constituted plain error. The district court's omission would only be error if, in light of the information contained in the record, a reasonable judge would have experienced genuine doubt regarding the defendant's competence. *United*

*States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008). In determining whether such doubt exists, we must consider the following factors: "the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence." *Id*. (internal quotation marks omitted). None of these factors support the majority's conclusion that there was "substantial evidence" sufficient to raise a genuine doubt that Dreyer was incompetent to be sentenced. *Id*. (internal quotation marks omitted).

Three reports compiled by four medical experts each concluded that Dreyer suffered from early stage frontotemporal dementia. None opined that Dreyer's medical condition rendered him legally incompetent. Instead, the doctors expressly found that Dreyer's dementia did not "cause[] him to be unaware of the nature and consequences of his behavior, or that what he was doing was wrong," that Dreyer's "cognitive skills were intact," and that Dreyer was "competent to plead guilty." *Dreyer*, 693 F.3d at 816 (Callahan, J., dissenting) (internal quotation marks omitted).

Furthermore, as Dreyer concedes, he "did not manifest any observable signs of incompetency during the sentencing hearing." *Id*. at 817. He responded to the district court's inquiries in a coherent and respectful manner, and appeared to interact with his attorneys thoughtfully and to respond appropriately to evidence introduced against him. Although Dreyer declined to participate in allocution, this decision does not necessarily evidence incompetence, but rather is merely one factor that must be evaluated when considering whether Dreyer could "understand the nature and consequences of the proceedings against him [and] to assist properly in his defense." 18 U.S.C. § 4241(a).

The district court was fully aware that Dreyer suffered from a medical disorder that at times impaired his inhibition and insight. The district judge reviewed the expert reports evaluating Dreyer's mental health, considered Dreyer's medical condition in calculating an appropriate sentence, and personally observed Dreyer's behavior in court. In finding plain error, the majority disregarded the district court's assessment of a fact-intensive competency inquiry, which is necessarily informed by the judge's personal perception of Dreyer's behavior at sentencing. On this record, the alleged failure to order a competency evaluation was not an "error that is so clear-cut, so obvious" that no competent district judge would have imposed sentence in its absence. *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir. 1997). As a result, the majority's conclusion that the district court committed plain error is not defensible.

## II

The majority's conclusion is a significant expansion of existing precedent, under which we have found plain error only when the quality and magnitude of mental health evidence far exceeded what has been presented in this case. The evidence of Dreyer's mental deficiencies does not begin to approximate the record of delusional psychosis and brain damage suffered by the defendants in *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011), and *Odle v. Woodford*, 238 F.3d 1084 (9th Cir. 2001).

In *Duncan*, we held that the district court erred in failing to order a competency hearing before imposing sentence. In that case, three experts concluded that the defendant suffered from delusions and was incompetent to represent himself,

MRI and PET scans showed "an unusual brain structure consistent with behavioral deficits in the ability to make rational plans and modulate emotions," and defense counsel expressed genuine concern regarding the defendant's competency. *Duncan*, 643 F.3d at 1249 (internal quotation marks omitted).

In *Odle*, we found error after noting that the defendant suffered severe trauma requiring the removal of a grapefruit-sized portion of his brain, attempted suicide, and was committed to psychiatric wards three times in as many years. *Odle*, 238 F.3d at 1088–89. Medical reports and expert evaluations evidenced that the defendant had an "organic brain disorder," experienced hallucinations, "seemed confused," and "beat his head against the wall." *Id.* Given the defendant's lengthy medical history demonstrating severe mental impairments, we found that: "Where a petitioner has suffered massive trauma to his brain and subsequently exhibits psychotic behavior, some of it while awaiting trial, an inquiry into whether he possesses the mental acuity to participate in the proceedings is the reasonable and appropriate course of action." *Id.* at 1089.

None of the expert reports evaluating Dreyer's mental state identify any symptoms, diagnoses, or conditions that rise to the level of mental impairment evidenced in *Duncan* or *Odle*. Instead, the experts' conclusions support a finding that Dreyer was competent to be sentenced. Defense counsel's statements at sentencing do not alter this analysis. Counsel informed the court that Dreyer would not allocute due to his frontotemporal dementia, which might cause him to "speak inappropriately," "make denials," or "not accept responsibility." *Dreyer*, 693 F.3d at 807 (majority opinion).

These statements were fully consistent with the district court's prior understanding of Dreyer's impaired verbal, behavioral, and impulse control, and should not have created any further doubt as to Dreyer's competency to be sentenced. Absent further medical evidence of impaired comprehension, it was inappropriate under plain error review for the panel majority to declare that a reasonable jurist would have a genuine doubt as to Dreyer's competency.

## III

The majority's conclusion cannot be reconciled with our prior cases in which we held that plain error was not established. As the dissent accurately notes, when a "defendant has a medical or mental health condition that may affect the brain but does not interfere with the defendant's ability to rationally consult with his attorney and understand the proceedings, this Court has *not* found sufficient evidence of incompetenc[y]" to support a finding of plain error. *Id*. at 820 (Callahan, J., dissenting) (emphasis added).

For example, in *United States v. White*, 670 F.3d 1077, 1084–85 (9th Cir. 2012), we found that "a reasonable judge [would not have] a bona fide doubt" as to the defendant's competency, even though the defendant exhibited outbursts in court and his attorneys indicated that he may suffer from delusions. In *United States v. Mendez-Sanchez*, 563 F.3d 935, 940–41, 948 (9th Cir. 2009), we concluded that the district court did not plainly err in failing to *sua sponte* order a competency hearing, despite evidence that the defendant behaved irrationally and experienced difficulties communicating with his counsel.

The majority attempts to distinguish these cases, concluding that neither involved a defendant with a "diagnos[ed] . . . medical disorder bearing on the defendant's mental state." *Dreyer*, 693 F.3d at 812 (majority opinion). However, this distinction misses the point. The sole inquiry must be whether the defendant was incapable of comprehending the proceedings or rationally communicating with counsel. *See* 18 U.S.C. § 4241(a). The impact of a medical condition on a defendant's mental state is irrelevant unless the identified deficiencies interfere with the defendant's ability to consult with his attorney or understand the proceedings.

## IV

The majority assigns improper weight to the fact that Dreyer chose not to allocute. In doing so, the majority adds to the existing standard of legal competence by requiring that the defendant be able to speak persuasively on his own behalf at sentencing. *See United States v. Fernandez*, 388 F.3d 1199, 1251 (9th Cir. 2004). According to the majority opinion, "[c]ompetenc[y] at sentencing therefore requires . . . that the defendant be able to . . . participat[e] in his 'elementary right' of allocution." *Dreyer*, 693 F.3d at 809. We have never held that a defendant's election not to allocute, even if compelled by a medical or physical condition, is alone sufficient to require a competency hearing. Unable to rely on prior precedent, the majority manufactures a new competency standard out of whole cloth.

The majority's opinion suggests that a district court must *sua sponte* conduct a competency hearing anytime a defendant declines to speak at sentencing because of a "diagnose[d] . . .

medical disorder affecting the defendant's mental condition." *Dreyer*, 693 F.3d at 812. This quoted language necessarily encompasses a wide range of potential psychological and mental impairments. Nothing in the majority's opinion limits its impact to defendants who have organic causes for their mental impairment or degenerative diseases that have a clear effect on the structure of their brain. Without further guidance, a district court may rationally conclude that it must *sua sponte* order a hearing when any number of impairments are identified. This result imposes a substantial burden on district courts and will only unnecessarily complicate sentencing proceedings.

## V

The district court did not commit plain error, defined as an "error that is so clear-cut, so obvious," that no "competent district judge" would make such a mistake, even "without the benefit of objection." *Turman*, 122 F.3d at 1170. The majority's decision cannot be reconciled with our prior precedents, under which we have found plain error only when the quality and magnitude of mental health evidence far exceeded what has been presented in this case. In their place, the majority has crafted an opinion that alters the existing standard for legal competence, fails to accord adequate respect for district courts charged with conducting sentencing proceedings, and undermines the finality of properly imposed criminal sentences. In light of the substantial medical evidence already available to the district court, there was no error seriously affecting the fairness, integrity, or reputation of the sentencing proceedings.

District courts now face the real risk of reversal for declining to act when neither party suggests there is a competency concern but the defendant elects not to allocute for medical reasons. Applying the majority's opinion, reversal will be required even though the defendant's condition does not impact the defendant's ability to understand the sentencing proceedings or to rationally communicate with counsel. In attempting to comply with this misguided decision, district courts are left to navigate the shoals of Scylla and Charybdis. The Court should have voted to rehear this case en banc to remove this hazard to navigation.

---

**OPINION**

REINHARDT, Circuit Judge:

At the age of 63, Joel Dreyer experienced the onset of frontotemporal dementia, a degenerative brain disorder that causes changes in personality and behavior, impairs social interactions, and causes disinhibition and a loss of insight and impulse control. He was a practicing psychiatrist at the time. From the age of 66 to 69, despite having no criminal history, Dreyer participated in a conspiracy to distribute controlled substances, and in December 2010, at the age of 73, he was sentenced to ten years imprisonment after he pleaded guilty to charges related to that conspiracy.

At the sentencing hearing, the district court was provided with three expert reports: all three diagnosed Dreyer with frontotemporal dementia and noted that he exhibited textbook

manifestations of the condition since its apparent onset in 2001, three years before his participation in the controlled substance conspiracy, and that his symptoms persisted into the present. Dreyer did not allocute at sentencing and defense counsel informed the court that his client would not address it due to the dementia's effect on his behavior. Defense counsel did not move for a competency hearing and the district court did not order a hearing *sua sponte*. The court sentenced Dreyer to 120 months. Dreyer appeals his sentence, contending that the district court erred by failing *sua sponte* to order an evidentiary hearing to determine his competency at the time of sentencing.

We hold that the record before the district court at sentencing was sufficient to cause a genuine doubt as to the defendant's competence and that the court committed plain error by failing to order a hearing *sua sponte*. Accordingly, we vacate Dreyer's sentence and remand for the district court to evaluate Dreyer's competency on the basis of an evidentiary hearing.

**BACKGROUND**

Dreyer experienced a medical emergency in 2001 that coincided with the onset of frontotemporal dementia. Immediately after being released from the hospital, Dreyer's family noticed significant changes in his personality and behavior. Within a few years Dreyer ended his previously-happy marriage to his wife of 17 years, engaged in uncharacteristic behavior and withdrew from his family to such a degree that friends and relatives concluded that he was

exhibiting early signs of dementia.[1]   Despite the family's concerns, his illness remained undiagnosed.  In 2004, the 66-year-old Dreyer, a licensed psychiatrist, began providing prescriptions of oxycodone and hydrocodone to patients outside of the usual course of professional practice.  In 2007 Dreyer was indicted on charges related to his participation in a conspiracy to possess and to distribute controlled substances.  Although Dreyer had difficulty recognizing or admitting that his actions were inconsistent with professional standards of conduct, he nonetheless pleaded guilty in September 2009 to two counts of the thirty count indictment.

Prior to sentencing, Dreyer submitted three different expert reports to the court, all of which diagnosed him as suffering from frontotemporal dementia.[2]  Two of the reports were obtained from experts hired by the defense, while the third expert was selected by the government but jointly commissioned by both parties.   All three reports were

---

[1] Dreyer's family recounted a number of instances in which he behaved in ways that starkly contrasted with his pre-onset behavior.  Among them was an instance when Dreyer appeared wearing dress slacks and nude from the waist up in the lobby of an expensive hotel to meet with his daughter and a family friend.  His daughter also described Dreyer as behaving "detached and aloof" at her younger son's bar mitzvah, going so far as to read a newspaper in the temple while his grandson gave his speech.  This was a marked contrast from her first son's bar mitzvah, at which the defendant "was engaged, singing [and] shedding tears of joy."

[2] At Dreyer's change of plea hearing, he informed the court that a doctor had identified frontal lobe damage in his brain.  At the time, Dreyer's counsel made no comments regarding the effect of this condition on Dreyer's ability to assist in his defense and the court did not have the benefit of any of these expert reports; all three reports were completed after Dreyer entered his guilty plea.

consistent in their diagnoses and descriptions of Dreyer's symptoms. The joint report authored by the expert recommended by the prosecution, Dr. Martell, noted that Dreyer exhibited "behavioral disinhibition, frontal lobe cognitive dysfunction, memory impairment, loss of smell (anosmia), impaired word-finding ability (dysnomia), hypersexuality, loss of tact and social propriety, and lack of insight into his own impairments (anosagnosia)." The Martell report noted that Dreyer's affect was normal and that he retained the ability to articulate, but that he suffered from "moderately severe impairment" in  three areas of brain functioning: executive control, language, and memory. The report also stated that this condition affected his behavior and ability to communicate, as well as his ability to regulate his speech appropriately or to have insight into his own behavior.

Doctors Amen and Krause authored one of the two reports commissioned by the defense ("the Amen/Krause report"). Their report included brain imaging results showing "extensive frontal lobe damage" causing "his judgment [to] be severely impaired and his insight also impaired." The results of their neuropsychological testing similarly "revealed deficits that are consistent with Frontotemporal Dementia," which "affects the part of the brain that regulates comportment, insight and reasoning." Dr. Rudnick, the author of the final report, also concluded that Dreyer suffered from "impaired judgment, disinhibition and impulsivity that . . . rendered him vulnerable to acting rashly and without consideration of the consequences." He stated that Dreyer's history reflected a "textbook description of [frontotemporal dementia]," which "present[s] in the early phases with behavioral and personality changes, with cognitive deficits appearing later." Rudnick reported that Dreyer's "verbal

output was laced with inappropriate sexual references, profanity and facetiousness [and] [h]e exhibited impulsivity in his responses, disinhibition and expansiveness to the point of grandiosity." Despite Dreyer's propensity for falsehoods and exaggerations, the doctor stated that "any distortions are the result of his faulty judgment, insight and recall rather than intentional misrepresentation." Rudnick concluded by noting the degenerative nature of the disease. He observed that frontotemporal dementia is both "irreversible and progressive," and that Dreyer's "long-term prognosis is quite dismal," with an average life span of 3.4 years from the time of diagnosis and a diminishing ability to live independently in the interim.

The evaluations of the four experts consulted were substantially similar, and the reports explicitly disagreed only in their conclusions about Dreyer's competency. Martell's report specifically opined as to whether Dreyer was incompetent when he entered his guilty plea. Martell concluded that he was competent at the time of his plea and had taken "full responsibility for having engaged in improper prescribing practices." When he considered Dreyer's mental state at the time of the offense, however, he acknowledged that Dreyer "engaged in the behaviors for which he has plead guilty while suffering from Dementia and an organic personality disorder that rendered him disinhibited, and impaired his judgment," and that this fact "may mitigate or reduce his culpability . . . as his moral compass was effectively compromised by brain damage over which he had impaired control." The Amen/Krause report came to a contrary conclusion as to Dreyer's competency: it concluded that the dementia "caused him to engage in activities that he may not have clearly understood such as in the plea

agreement." Rudnick's report did not offer any explicit conclusions as to Dreyer's competency, but stated, consistent with the other reports, that "his dementia prevented him from accurately critiquing or monitoring his own behavior and from foreseeing its consequences," and that throughout the time that he engaged in the activities for which he was being prosecuted, Dreyer "was truly convinced that his actions did not constitute professional violations."

All three expert reports were submitted to the court prior to Dreyer's sentencing hearing in December 2010. The presentence report recommended a sentence between 188 and 235 months, and the government requested a sentence of 121 months. Dreyer's attorney argued for a sentence of probation due to Dreyer's deteriorating health and the fact that his unlawful conduct was precipitated by the onset of a disease that substantially impaired his ability to make decisions and differentiate right from wrong. Explaining the effect of frontotemporal dementia, counsel stated that "[t]his disease takes people, and it doesn't rob them of their intellect, it robs them of their moral compass." He equated the proposed 121-month sentence to a death sentence for the then-73-year-old Dreyer, due to the progression of the disease and unfavorable prognosis.

Dreyer did not speak on his own behalf at sentencing. His attorney explained his decision to direct Dreyer not to speak as follows:

> My client isn't going to speak today because one of the characteristics of the disease is that I don't know what he's going to say. He could speak inappropriately. He could make

denials.  He could accept responsibility, then
not accept responsibility.       That's also a
characteristic of this disease.

Counsel went on to ask for mercy on Dreyer's behalf, asking
the court to "understand that Dr. Dreyer is partially with us,
partially not with us, and that's why he's not speaking.  I can't
even imagine what he would say to you, Your Honor, and I
can't even imagine what his perception of the truth is in 50
percent of the cases."  After defense counsel presented his
argument on behalf of Dreyer, the district court fulfilled its
obligation to personally address the defendant.  In response,
Dreyer stated that he respected the judge and appreciated her
comments.

The court sentenced Dreyer to 120 months and made a
recommendation to the Bureau of Prisons that Dreyer be
housed at the federal medical center in Rochester, Minnesota.
Dreyer appeals his sentence contending that the district court
erred by failing *sua sponte* to order an evidentiary hearing to
determine whether he was competent at the time of
sentencing.

## DISCUSSION

## I.

The district court has a statutory duty to "order . . .a
[competency] hearing on its own motion, if there is
reasonable cause to believe that the defendant may presently
be suffering from a mental disease or defect rendering him
mentally incompetent to the extent that he is unable to
understand the nature and consequences of the proceedings

against him or to assist properly in his defense." 18 U.S.C. § 4241(a). "On review, [the] inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether [the reviewing court] would find the defendant incompetent . . . . Rather, the record is reviewed to see if the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence." *United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008) (alterations in original) (internal citations and quotation marks omitted). Here, the district court committed error by failing to order a competency hearing *sua sponte* despite a record that raises a genuine doubt that the defendant was incapable of assisting properly at the sentencing proceeding.

Alleged errors that are unobjected to in the district court are generally subject to plain error review. *United States v. Olano*, 507 U.S. 725, 731–32 (1993). We have explicitly applied the plain error standard in our review of the district court's failure *sua sponte* to order a competency hearing. *Marks*, 530 F.3d at 814; *United States v. Fernandez*, 388 F.3d 1199, 1250–51 (9th Cir. 2004). *But see United States v. Mitchell*, 502 F.3d 931, 986–97 (9th Cir. 2007) (not subjecting the trial court's failure *sua sponte* to conduct a competency hearing to plain error review). "Relief for plain error is available if there has been (1) error; (2) that was plain; (3) that affected substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Cannel*, 517 F.3d 1172, 1176 (9th Cir. 2008). As a practical matter, a district court's failure to conduct a competency hearing on its own motion will always be subject to plain error review. This is because a defense counsel who is attuned to his client's

mental condition and recognizes that the defendant's competency is in question would not leave it up to the district court to order a competency hearing *sua sponte*, rather, he would move for such a hearing himself. If his motion was denied we would then evaluate the district court's denial of the motion rather than its failure to order a hearing *sua sponte*. *See, e.g.*, *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011). Therefore, the question currently before us, whether the district court's failure to order a competency hearing *sua sponte*, will always be raised for the first time on appeal.

If we find that "evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence," *Chavez v. United States*, 656 F.2d 512, 516 (9th Cir. 1981), then the first two prongs of the *Olano* test are satisfied, leaving the questions of substantial rights and fairness. One of the foundational principles of our judicial system is the belief that an individual should neither be allowed to stand trial nor have his sentence carried out if he is incompetent. *See, e.g.*, *Riggins v. Nevada*, 504 U.S. 127, 139–140 (1992) (Kennedy, J., concurring in the judgment) ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial.") (citing *Drope v. Missouri*, 420 U.S. 162, 171-172 (1975)). Allowing a judicial proceeding to continue when there is genuine doubt as to the competence of the accused plainly implicates the substantial rights of the accused and seriously affects the fairness, integrity and public reputation of the judicial proceedings. Thus, while we must subject Dreyer's claim to plain error review, the analysis is ultimately reducible to the question of whether "the evidence of incompetence was such that a

reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence." *Chavez*, 656 F.2d at 516. Where the answer is yes, the failure to order a competency hearing *sua sponte* is plain error.

**II**.

Here, we must determine whether the district court had before it sufficient evidence to create a bona fide doubt as to Dreyer's competency. "Competence is defined as the ability to understand the proceedings and to assist counsel in preparing a defense." *Miles v. Stainer*, 108 F.3d, 1109, 1112 (9th Cir. 1997) (citing *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam)). "[T]he competency right does not end at a conviction," but rather persists through sentencing. *Duncan*, 643 F.3d at 1248; *U.S. v. Ahrendt*, 560 F.3d 69, 74 (1st Cir. 2009) ("The obligation to determine competency to stand trial is continuing, and persists throughout a proceeding including through the sentencing phase."); *see also* 18 U.S.C. 4241(a) (noting that the inquiry into a defendant's competence may take place "any time after the commencement of a prosecution . . . and prior to the sentencing of the defendant."). The record raises a question as to the defendant's competence if there is substantial evidence that, due to a mental disease or defect, the defendant is either "unable to understand the nature and consequences of the proceedings against him *or* to assist properly in his defense." *United States v. Friedman*, 366 F.3d 975, 980 (9th Cir. 2004) (emphasis in original) (quoting 18 U.S.C. § 4241(d)) (holding that the district court properly found the defendant incompetent where he was able to understand the proceedings but not capable of assisting properly in his defense). Although the level of competency mandated by due

process does not vary based on the specific stage of the criminal proceeding, *Godinez v. Moran*, 509 U.S. 389, 400–01 (1993), the defendant's ability to participate or assist his counsel must be evaluated in light of the type of participation required.

"Sentencing is a critical stage of the criminal process," *Boardman v. Estelle*, 957 F.2d 1523, 1525 (9th Cir. 1992) (citing *Mempha v. Rhay*, 389 U.S. 128, 134 (1967)), and the defendant's allocution, "is an essential element of a criminal defense." *Id.* at 1526. Competence at sentencing therefore requires, among other things, that the defendant be able to assist in his own defense by participating in his "elementary right" of allocution. *Id.* at 1527 (quoting *United States v. Behrens*, 375 U.S. 162, 84 (1963)). Although a defendant is not compelled to speak on his own behalf at sentencing, courts have long recognized the importance of affording him such an opportunity. The creation of various procedural protections has not "lessen[ed] the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green v. United States*, 365 U.S. 301, 304 (1961). At sentencing, "the test [of competency] is whether the defendant is able to understand the nature of the proceedings and participate intelligently to the extent participation is called for." *Chavez*, 656 F.2d at 518 (9th Cir. 1981). The ability to allocute, in short, is an essential element of this participation.

At sentencing Dreyer refrained from allocuting. While the defendant has the right to make this choice, defense counsel explained the reason underlying Dreyer's silence: his disease

prevented him from coherently speaking on his own behalf. Counsel expressed concern that Dreyer might contradict himself by accepting responsibility and then refusing to do so, or would speak to the court inappropriately. He also explicitly informed the court that Dreyer had difficulty perceiving the truth as a result of his dementia and was only "partially with us." The decision not to allocute was therefore obviously viewed by the defense as necessitated by Dreyer's medical condition.

Although it is true that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense," *Medina v. California*, 505 U.S. 437, 450 (1992), the district court need not have relied merely on the defense counsel's statements to determine whether Dreyer's competence was in question. Counsel's assessment of Dreyer was supported by all three medical evaluations presented to the court. Although the medical experts described Dreyer as generally cooperative and articulate, they also found his behavior to be inappropriate, his personality emotionally-blunted, and his speech laced with sexual references and profanity. He was prone to lies and exaggerations due to his faulty judgment, insight and recall. Despite Dreyer's apparent proclivity for falsehood, the experts observed that these statements were not made in a deliberate attempt to misrepresent the truth. Dreyer lacked an awareness of social norms of comportment and exhibited poor social judgment and a penchant for engaging in provocative and antagonistic behavior had already resulted in his receiving a severe beating during his brief prison stay. The experts explicitly recognized that Dreyer had a "profound lack of social propriety," and an inability to "filter himself effectively." They additionally noted that he was prone to

making inflammatory religious and racial statements that conflicted with his long-held beliefs, and that, if incarcerated, he would need protective custody "essentially to protect him from himself." As a result of his frontotemporal dementia, Dreyer was not only incapable of making a reasoned plea for leniency, but was unable to even refrain from making comments that were contrary to his own beliefs and that placed him in physical danger. The uncontradicted medical evidence before the district court supported counsel's representation that Dreyer's failure to allocute was compelled by his ailment and his resultant inability to regulate his speech or behavior in a manner that could assist in his defense. Given the consistency between counsel's statements and the supporting expert reports, the district court had substantial evidence before it that should have created a reasonable doubt in its mind as to Dreyer's ability to assist in his own defense, and thus as to his competency.

## III.

The cases in which this court has concluded that there was no basis for the trial court to doubt the defendant's competency, including all those cited by the government, involve substantially less evidence to suggest incompetency than the case before us. For instance, in *United States v. Mendez-Sanchez*, 563 F.3d 935, 939–40 (9th Cir. 2009), there was no diagnosis of any mental disorder or defect. The defendant was uncooperative with his attorneys, but when asked explicitly by the judge whether the defendant might be incompetent, defense counsel reported that they did not believe that he was. *Id.* at 941–42; 947–48. Instead, counsel told the court, the defendant's difficulties were based solely on a refusal to accept facts which he did not like. *Id.* In

*Marks*, 530 F.3d 799 (9th Cir. 2008), the defendant was rude, asserted that the court lacked jurisdiction over him and was uncooperative with counsel. 530 F.3d at 814–15. Again, however, there was no medical diagnosis to suggest that the defendant might be incompetent, and his counsel did not alert the court to any possible difficulties. In *Davis v. Woodford*, 384 F.3d 628 (9th Cir. 2004), the defendant refused to wear civilian clothes or sit at the counsel table. There was no medical evidence indicating any kind of ailment, nor did counsel assert that the defendant was incapable of assisting in his defense. *Id.* at 645–46. On appeal the defendant alleged only that "[t]he trial court judge was in a position to gauge whether a competency hearing would be in order," but this court determined that his unusual behavior alone was insufficient to create a genuine doubt as to his competency, and that his actions reflected a reasoned choice. *Id.* at 646.

In all of these cases, there was only comparatively minor inappropriate courtroom behavior. There was no evidence that the defendant would be unable to understand or participate in the proceedings. In contrast to Dreyer's sentencing proceedings, there were no statements by counsel or medical diagnoses that would have produced a genuine doubt as to the defendant's competency in the mind of a reasonable judge. In fact, in these cases when medical evidence was presented, or defense counsel made a statement to the court regarding the defendant's competence, the evidence supported a finding of competency. Here, the opposite is true. The court had a clear diagnosis of frontotemporal dementia from multiple sources, including one selected by the government, and all of the expert reports noted the defendant's inability to regulate his behavior and speech as a result of this illness. The court also had counsel's

express statements that the defendant would not speak on his own behalf as a result of his medical condition. The cases cited by the government are therefore inapplicable.[3]

When this court has considered a record containing expert diagnoses of a medical disorder bearing on the defendant's mental state we have found this evidence sufficient to cause genuine doubt as to the defendant's competency. *See, e.g.*, *Deere v. Woodford*, 339 F.3d 1084, 1086–87 (9th Cir. 2003); *Odle v. Woodford*, 238 F.3d 1084, 1088–89 (9th Cir. 2001); *Morris v. United States*, 414 F.2d 258 (9th Cir. 1969) (per curiam). Even in the absence of expert evidence, we have found cause to grant a motion for a competency hearing when defense counsel reported an attempted suicide by the defendant the night before trial. *United States v. Loyola-*

---

[3] A case relied on heavily in the dissent, *United States v. White*, 670 F.3d 1077 (9th Cir. 2012), is also inapplicable and presents an entirely different issue. In *White*, the issue presented was whether the district court committed error by failing to order a *second* competency hearing sua sponte after the court had previously conducting a hearing on the matter and found the defendant to be competent to stand trial. The court in *White* recognized that, where, as here, a hearing has not previously been held, the proper standard of review "is comprehensive and not limited by either the abuse of discretion or clearly erroneous standard," and error occurs when the reviewing court determines that the evidence before the trial court "raises a bona fide doubt as to whether the defendant has become incompetent." *White*, 670 F.3d at 1082 (internal citations and quotation marks omitted). Where, as in *White*, a competency hearing has already been conducted and in that hearing the defendant has been found competent, *White* holds that the standard of review is more deferential and error can be found only if the failure to order a second hearing sua sponte constitutes an abuse of discretion. *Id.* In Dreyer's case, there was no prior hearing as to his competency, and thus we must conduct, as *White* reaffirms, a "comprehensive [review] not limited by either the abuse of discretion or clearly erroneous standard." *Id.*

*Dominguez*, 125 F.3d 1315 (9th Cir. 1997). District courts to which such evidence is presented are obligated to determine only whether doubt has been created, not whether the defendant is competent or incompetent. In such cases that question can ordinarily be resolved only after an evidentiary hearing.

Although each case presents a unique set of facts, the case that involved the most comparable record before the district court is *Duncan*, 643 F.3d 1242 (9th Cir. 2011).[4] In *Duncan*, the record before the district judge included five competing expert reports: two from court-appointed experts that found "no evidence of psychotic behaviors or thought processes," *id.* at 1246, and three from defense experts that found that the defendant suffered from "severe psychosis," *id.* at 1249, and were accompanied by a brain scan showing "unusual brain structure consistent with behavioral deficits in the ability to make rational plans and modulate emotions." *Id.* at 1249. The record also included letters written by the defendant, some of which "appear[ed] rational" while the others included statements that were "unusual." *Id.* at 1250. Lastly, as evidenced by the motion for a competency hearing, counsel in *Duncan* also expressed a belief that the defendant was not competent. *Id.* at 1245. On review this court concluded that the evidence presented to the district court created a "reasonable doubt about the Defendant's competence, such

---

[4] Although *Duncan* involved the district court's decision not to hold a formal competency hearing despite defense counsel's motion, on appeal the analysis is the same: "whether a reasonable judge, situated as was the trial judge who denied the motion, should have experienced doubt with respect to the defendant's competence." *Duncan*, 643 F.3d at 1247.

that § 4241(a) required a full competency hearing before the district court could reach a decision." *Id.* at 1250.

The trial court here, as in *Duncan*, was faced with a record that included diagnoses of a medical disorder affecting the defendant's mental condition and behavior. Although Dreyer's counsel did not move for a competency hearing, he explicitly informed the court that his client's disease prevented him from participating in his defense to the extent that further participation was called for. As in *Duncan*, we must therefore conclude that the evidence on the record was sufficient to create a reasonable doubt as to Dreyer's competence and thus compelled the district court to order a competency hearing *sua sponte*.

The government primarily relies on Dreyer's calm demeanor at sentencing to argue that the record was insufficient to create reasonable doubt as to his competence. Among the factors to consider when evaluating whether a court erred in failing to order a competency hearing *sua sponte*, are the "defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence," *Drope*, 420 U.S. 162, 180 (1975), however, "[n]one of these factors is determinative," *Miles*, 108 F.3d 1109, 1112 (9th Cir. 1997), and "even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 420 U.S. at 180. While the defendant's courtroom behavior may provide insight into his mental condition, we have previously observed that a "judge may be lulled into believing that [the defendant] is competent by the fact that he does not disrupt the proceedings, yet this passivity may itself mask an incompetence to meaningfully participate in the process." *Odle*, 238 F.3d at 1089. Here, according to the undisputed

facts in the record, counsel's decision that Dreyer should not allocute was "a strategy for controlling his behavior," *id.* at 1089, n.6; it was necessitated by a mental ailment, and was not proof of Dreyer's competence. Dreyer's condition, as described in detail by the three expert reports, did not manifest itself in violent outbursts, but instead prevented him from expressing himself appropriately or in a manner that could assist in his defense. Given the expert opinions that supported defense counsel's representation that Dreyer was unable to assist in his defense due to his medical condition, the record creates a genuine doubt as to Dreyer's competency even in the absence of observable courtroom antics.

## IV.

Given the substantial evidence of Dreyer's lack of competency, we hold that the district court's failure to order a competency hearing *sua sponte* constituted plain error. We vacate Dreyer's sentence and remand for the district court to hold an evidentiary hearing.

**VACATED and REMANDED.**

---

CALLAHAN, Circuit Judge, dissenting:

I respectfully dissent. I cannot agree that it was plain error for the district court not to sua sponte order a competency hearing after Joel Dreyer pleaded guilty and received the benefit of his plea agreement but before sentencing. Dreyer was represented by competent counsel and had been examined by a number of doctors. Although all agreed that

he suffered from frontotemporal dementia ("FTD"), none opined that Dreyer was not competent to participate in his sentencing. Moreover, although Dreyer chose not to allocute, he was responsive when the district judge addressed him personally, stating that he respected the judge and appreciated her comments. Even if the trial judge might have issued a sua sponte order for further psychiatric and medical evaluations, failure to do so was not plain error.

I do not question the majority's genuine doubt regarding Dreyer's competence. However, this does not allow it to substitute its opinion for what a reasonable judge would be expected to experience. *Cf. Chavez v. United States*, 656 F.2d 512, 515–16 (9th Cir. 1981) (overruled on other grounds). The rule reflects the fact that appellate judges viewing the cold record are not in as good a position to evaluate a defendant's competence as the district court judge who has interacted with the defendant over the course of many hearings. The majority thus does exactly what we said we could not do in *Chavez*: it disguises its own doubts about Dreyer's competence as what "a reasonable judge would be expected to experience." *See id.* The record does not show that a reasonable judge would have experienced a "genuine doubt respecting [Dreyer's] competence." *See id.*

## I. Background

Between May of 2004 and July of 2007, Dreyer conspired with his co-defendant to distribute oxycodone, an addictive Schedule II controlled substance, dispensing over 20,000 pills over the course of approximately three years. Additionally, Dreyer unlawfully distributed another 17,746 oxycodone pills and 78,923 hydrocodone pills independent of his co-

defendant.  One of Dreyer's patients was Jessica Tia Silva, who died of an overdose of Dreyer's prescriptions to her. Another patient was 17-year-old Jeremy Brink, who Dreyer knew was a minor and without parental consent for treatment. Nevertheless Dreyer altered the patient's age on prescriptions for Norco and Xanax.  Dreyer prescribed these patients and many others lethal quantities of addictive drugs without conducting physical examinations of the patients or taking their medical histories and received $100-$200 for each prescription.  On September 21, 2009, Dreyer pleaded guilty, pursuant to a plea agreement, to two counts: (1) conspiracy to possess with the intent to distribute oxycodone and to distribute oxycodone; and (2) unlawful distribution and dispensing of oxycodone.

After Dreyer pleaded guilty, but before his sentencing hearing, he underwent several medical and psychological evaluations by four experts.  Dr. Daniel G. Amen and Dr. Christine D. Krause prepared a June 1, 2010 report (the "Amen/Krause Report") detailing their findings from their evaluations of Dreyer.  Dr. Amen and Dr. Krause were retained by the defense.  Dr. Amen performed a scan of Dreyer's brain, and Dr. Krause (a neuroclinical psychologist) performed a forensic evaluation of Dreyer.  The Amen/Krause Report concluded that Dreyer "manifests symptoms of early Frontotemporal Dementia which has caused him to engage in activities that he may not have clearly understood such as in the plea agreement.  He has also exhibited poor judgment in several incidences over the past few years that were not typical of his behavior prior to his medical emergency."  The Amen/Krause Report also explained that patients suffering from FTD commonly have "executive function and reasoning deficits."

On August 9–10, 2010, Dr. Daniel A. Martell ("Dr. Martell"), a forensic psychologist, also evaluated Dreyer and prepared a report (the "Martell Report"). The purpose of this evaluation was to determine whether any impairment: (1) affected Dreyer's competence to plead guilty; (2) affected Dreyer's mental state during the offenses; or (3) will affect Dreyer's adjustment or put him at risk in prison. Dr. Martell agreed that Dreyer had FTD, as "characterized by the cluster of symptoms exhibited by Dreyer, including: behavioral disinhibition, frontal lobe cognitive dysfunction, memory impairment, loss of smell (anosmia), impaired word-finding ability (dysnomia), hypersexuality, loss of tact and social propriety, and lack of insight into his own impairments (anosagnosia)." Dr. Martell opined that "[t]his is not to say, however, that his condition caused him to be unaware of the nature and consequences of his behavior, or that what he was doing was wrong. Rather it may mitigate or reduce his culpability in the eyes of the court as his moral compass was effectively compromised by brain damage over which he had impaired control." Significantly, despite his conclusions about Dreyer's FTD, Dr. Martell also opined that Dreyer's guilty plea was knowing, intelligent, and voluntary. Dr. Martell concluded that Dreyer was "indeed competent to plead guilty."

On November 20, 2010, Dreyer was evaluated by Dr. F. David Rudnick ("Dr. Rudnick"), a psychiatrist specializing in neurobehavior. Dr. Rudnick reviewed the other two medical reports and then conducted his own clinical tests of Dreyer. Dr. Rudnick's report (the "Rudnick Report") also concluded that Dreyer exhibited symptoms of FTD. Dr. Rudnick opined that Dreyer's "dementia prevented him from accurately critiquing or monitoring his own behavior and from

foreseeing its consequences. He was truly convinced that his actions did not constitute professional violations." However, Dr. Rudnick also stated that, with minor exceptions, Dreyer's "cognitive skills were intact."

## II. Sentencing Hearing

On December 13, 2010, over fourteen months after Dreyer pleaded guilty, the district court conducted Dreyer's sentencing hearing. During the sentencing hearing, the district court judge stated that she had read all of the medical reports and the defense's memoranda about Dreyer's medical condition. Dreyer did not ask for a competency hearing, but instead requested leniency in sentencing due to his medical condition. Nonetheless, the court explained that the evidence did not indicate that Dreyer was incompetent to be sentenced:

> There's a great deal of medical evidence that's been submitted to the Court about the defendant's medical condition, reports of which, not all of which is really substantiated. The self-reporting by the defendant is not always substantiated by the medical records. That is, the self-reported flat-lining and cardiac arrest . . . .
>
> [A]t the time of the arrest, which is, of course, very close in time to the conduct in question, the defendant spoke for hours to the agents. He was lucid, more than lucid, very articulate, cunning; and he lied to the detectives, the agents, over and over. He wasn't forgetful. So he may well have deteriorated since that

> time, and there's been medical evidence submitted to the Court about his current condition, but that is not necessarily a reason for him not to be sentenced now. And a reasonable sentence would include a period of incarceration.

The court further explained that:

> The defense relied heavily on the statements contained in the medical reports of Dr. Martell and Dr. Rudnick that he needs further treatment. I agree with that, and I believe he should be placed in [a Federal Medical Center], but that does not mean he should not receive a prison term.

The court then sentenced Dreyer to 120 months imprisonment—the low end of the guidelines range—and three years of supervised release.

### III.  Standard of Review

"On review, [the] inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether [the Court of Appeals] would find the defendant incompetent if [it] were deciding the matter *de novo*. Rather, [the Court of Appeals] reviews the record to see if the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence." *See Chavez*, 656 F.2d at 515–16 (overruled on other grounds). A defendant is competent to stand trial and be sentenced if he

has both a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." *United States v. Fernandez*, 388 F.3d 1199, 1251 (9th Cir. 2004). A district court's failure to sua sponte order a competency evaluation is only error if the evidence of incompetence is such that a reasonable judge would have a genuine doubt about the defendant's ability to rationally communicate with his attorney and understand the proceedings. *United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008). The factors this Court considers to determine whether there was sufficient evidence of incompetence are "the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence." *Id.*; *see also United States v. White*, 670 F.3d 1077, 1082 (9th Cir. 2012) (taking into consideration the trial judge's observation of the defendant over the course of the proceedings).

Importantly, "[w]here, as here, the issue is raised for the first time on appeal, we review a district court's decision not to sua sponte order a competency hearing for plain error." *See Marks*, 530 F.3d at 814 (citing *Fernandez*, 388 F.3d at 1250–51). "Plain error is '(1) error, (2) that is plain, and (3) that affect[s] substantial rights.'" *Id.* (alterations in original) (quoting *United States v. Thornton*, 511 F.3d 1221, 1225 n.2 (9th Cir. 2008)). "If these conditions are met, an appellate court may exercise its discretion to correct the error 'only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Thornton*, 511 F.3d at 1225 n.2 (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

## IV. Analysis

The district court did not err in failing to sua sponte order that Dreyer be evaluated for competency prior to imposing the sentence. A critical feature of this case, and one that distinguishes it from the cases relied upon by the majority, is that Dreyer is only claiming that he was not competent to be sentenced. He does *not* allege that he was incompetent to be tried or to plead guilty. Moreover, he admits that he "did not manifest any observable signs of incompetency during the sentencing hearing." Rather, he argues for the first time on appeal that medical reports he sought—*after* he entered a plea agreement but before he was sentenced—required that the district court sua sponte order a competency hearing, even though he never requested a competency hearing. A fair review of the record shows that there was no plain error and that even if there were error, it did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Cf. Thornton*, 511 F.3d at 1225 n.2.

### A. Dreyer's Medical Evaluations Were Not Conclusive.

Dreyer's medical evaluations indicate that while he suffers from FTD and has some related mental deficiencies, these deficiencies do not rise to the level of the legal standard of incompetence. One of the doctors expressly concluded that Dreyer was competent and another concluded that his "cognitive skills were intact." Dreyer does not attempt to demonstrate that his FTD prevented him from rationally conferring with his counsel or understanding the proceedings, which is the definition of legal incompetence. He does not explain how his diagnosis relates to this standard of

incompetence, but instead makes the misleading inference that impaired judgment and degenerative brain damage is equivalent to legal incompetence. In doing so, he conflates medical standards with the applicable legal standard of incompetence. Dreyer's medical records and behavior do not suggest that he had difficulty rationally conferring with his counsel and rationally understanding the proceedings. Instead, the record shows that he interacted with his attorneys and the court thoughtfully and even drafted a document titled "Brain Damage" during the presentence investigation, writing "[t]his is sad that I have a brain lesion of my frontal lobe but it could very well be the thing that keeps me out of federal prison." It appears that Dreyer rationally understood the nature of the proceedings against him and his attorney's strategy for seeking a reduced sentence.

Case law indicates that it is not sufficient to point out that a defendant has a medical ailment causing decreased brain function. Rather, the evidence must also reasonably indicate that the ailment prevented the defendant from rationally interacting with his attorney and understanding the sentencing proceedings. *See Marks*, 530 F.3d at 814; *Fernandez*, 388 F.3d at 1251. There is no such evidence of this kind of causal relationship here. Dr. Martell expressly reported that his findings regarding Dreyer's FTD did *not* indicate that "his condition caused him to be unaware of the nature and consequences of his behavior, or that what he was doing was wrong." Dr. Martell further opined that Dreyer's guilty plea was knowing, intelligent, and voluntary. Another doctor, Dr. Rudnick, reported that with minor exceptions, Dreyer still has functional cognitive skills. The district court had before it three medical examinations by four medical doctors, none of which indicated that Dreyer was legally incompetent.

## B.  Dreyer Did Not Exhibit Signs of Incompetence in Court.

The district court, having observed Dreyer's conduct over the course of multiple hearings, reasonably thought he was competent.  Dreyer himself admits that he "did not manifest any observable signs of incompetency during the sentencing hearing."   There is nothing in the record indicating that Dreyer exhibited signs of incompetency or unusual behavior in court.  Moreover, Dreyer's attorney who had extensive off-the-record interactions with Dreyer never indicated that he was incompetent.  This is significant because the district court judge was entitled to expect that if there was a serious question as to Dreyer's competence, his attorney would raise the issue.  Attorneys are the primary gatekeepers and have an affirmative duty to investigate their client's mental state "if there is evidence to suggest that the defendant is impaired." *See Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003).

The majority makes much of the fact that Dreyer chose not to allocute.  *See* Maj. Op. at 22–24.  Dreyer's attorney stated that he would not allocute because he might contradict himself or "speak inappropriately," and the majority suggests that this should have signaled Dreyer's incompetence to the district court judge.   However, the record supports other possible explanations for Dreyer's silence.  At the sentencing hearing, the judge noted that Dreyer had lied to the detectives "over and over."  Accordingly, Dreyer may have declined to speak to avoid having to explain his prior falsehoods and avoid the risk of uttering additional falsehoods.

In any case, there is no case law indicating that a decision not to allocute necessarily means that a defendant is incompetent to participate in his own sentencing hearing. A defendant may decline allocution for strategic reasons as well as for reasons related to a disability, mental health issues, or a host of behavioral concerns that do not rise to the level of incompetence. Since many criminal defendants do not enjoy perfect mental health or behave within social norms, the majority cannot mean that every time a defendant represented by counsel has a history of mental health and/or behavioral issues and chooses not to allocute, a court has a sua sponte duty to order a competency hearing. A decision not to allocute may be a factor in evaluating whether the trial court should have "experienced a genuine doubt respecting the defendant's competence," but without clearer evidence of incompetency in the medical records or unusual behavior in court, it is not enough. *Cf. Chavez*, 656 F.2d at 515–16.

## C. The Majority Relies On Factually Distinguishable Cases.

The cases cited by the majority do not support granting relief because: (1) they concern claims of incompetence to stand trial—not incompetence to be sentenced; (2) most concern pro se defendants—not defendants represented by counsel; and (3) all involved substantial histories of psychosis and/or severe brain damage—considerably more than is present in this case. *See, e.g.*, *Pate v. Robinson*, 383 U.S. 375, 385–86 (1966) (defendant had a brick dropped on his head, walked around in a daze, and defendant's mother stated that he had "lost his mind"); *Torres v. Prunty*, 223 F.3d 1103, 1104–06 (9th Cir. 2000) (defendant was diagnosed with a severe delusional disorder, had extensive brain damage from

head trauma, and had uncontrollable outbursts in court); *Odle v. Woodford*, 238 F.3d 1088–90 (9th Cir. 2001) (defendant suffered from hallucinations, was committed to a psychiatric ward at least four times, and had a temporal lobectomy removing a 3x3x4 inch piece of his brain).

In asserting that his medical evaluations evidence his incompetence, Dreyer relies extensively on *Odle*. The facts in *Odle* were very different. Odle claimed he was incompetent to stand trial because: (1) he had a lengthy medical history demonstrating severe mental health issues; (2) there was witness testimony indicating severe mental impairment, hallucinations, and multiple commitments to a psychiatric ward; and (3) he was "missing a piece of his brain the size of a grapefruit." *Id.* at 1088–90. Consequently, we held that there was substantial evidence of incompetence and the trial court should have ordered a competency evaluation sua sponte. *Id.* The Court reasoned that "[w]here a petitioner has suffered massive trauma to his brain and subsequently exhibits psychotic behavior, some of it while awaiting trial, an inquiry into whether he possesses the mental acuity to participate in the proceedings is the reasonable and appropriate course of action." *Id.* at 1089.

Unfortunately, Dreyer does have brain damage, but that is where the similarities between his case and the *Odle* case end. Likewise, the other cases that Dreyer relies on are distinguishable. In *United States v. Morris*, 414 F.2d 258, 258–59 (9th Cir. 1969), Morris challenged his conviction and sentence based on evidence that he had a history of severe mental illness and multiple documented periods of psychosis. The medical record in Dreyer's case does not contain the indicia of incompetence as present in *Odle* and *Morris*. On

the contrary, Dr. Martell opined that Dreyer was competent to plead guilty, and Dr. Rudnick found that Dreyer's cognitive skills were intact.

Moreover, the majority's seminal case, *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011), does not support its opinion for several reasons. First, *Duncan* involved the defendant's competence to represent himself during the penalty phase hearing and to waive his own right to appeal. *Duncan*, 643 F.3d at 1248–49. Indeed, defense counsel had moved for a competency hearing and the trial court denied the motion and allowed Duncan to proceed without counsel. *Id.* at 1242–48. We accordingly first held that standby counsel could appeal (against Duncan's wishes), and then we determined that Duncan was not competent to waive both his right to counsel and his right to appeal. *Id.* at 1244–49. Second, in *Duncan*, there was considerably more evidence of incompetence than is present in Dreyer's case. In *Duncan*:

> Standby counsel produced reports from three experts, all well established and highly regarded in the field of neuropsychiatry, who had examined Defendant personally and had found him to suffer from—in the words of one of the experts—"delusional beliefs, paranoia, grandiosity, and psychotic breaks with reality." All three experts formed the same opinion that—in the words of another of the experts—Defendant's "mental diseases and

defects render him incapable of rationally understanding and participating in the proceedings, and therefore incompetent."

*Id.* at 1249.

In contrast to the facts in *Duncan*, none of the doctors who examined Dreyer intimated that he was "incapable of rationally understanding and participating" in the sentencing proceedings. Dr. Martell opined that Dreyer's guilty plea was knowing, intelligent, and voluntary. Another doctor, Dr. Rudnick, reported that with minor exceptions, Dreyer's "cognitive skills were intact." Dr. Amen and Dr. Krause concluded that Dreyer "manifests symptoms of early Frontotemporal Dementia ["FTD"] which has caused him to engage in activities that he may not have clearly understood" and that Dreyer "exhibited poor judgment in several incidences." However, that report did not make any express finding regarding Dreyer's competence as three experts did in the *Duncan* case. *Duncan* is thus distinguishable on its facts, its procedural posture, and its standard of review.

## D. A Finding of Plain Error is Inconsistent with Our Prior Cases.

When the record indicates that the defendant has a medical or mental health condition that may affect the brain but does not interfere with the defendant's ability to rationally consult with his attorney and understand the proceedings, this Court has not found sufficient evidence of incompetence. *See, e.g.*, *White*, 670 F.3d at 1081–85 (defendant's angry outbursts in court and report indicating that White may have suffered from delusions was not substantial evidence of

incompetence); *Davis v. Woodford*, 384 F.3d 628, 646–47 (9th Cir. 2004) (defendant's depression and irrational conduct during trial was not substantial evidence of incompetence); *United States v. Mendez-Sanchez*, 563 F.3d 935, 939–40 (9th Cir. 2009) (defendant's irrational behavior and difficulties communicating with his lawyer was not substantial evidence of incompetence).

Most recently in *White*, we found that the district court did not err in failing to hold a sua sponte competency hearing in a case where the defendant lashed out in the courtroom, shouting obscenities and threats, spitting, and generally disrupting the proceedings. *White*, 670 F.3d at 1081. White's behavior was so uncontrollable that "[d]uring the twenty-five days of trial, White was able to remain in court without incident on only four days. On the other days, he either had to be removed or did not appear in the courtroom." *Id.* At some point during the trial, the court also received a report that White may have suffered from delusions. *Id.* at 1084. However, while recognizing that "[t]hese alleged delusions, in connection with White's repeated inappropriate behavior, may suggest that White had some kind of mental problem—or they may not," we concluded that the district court had not erred in failing to hold a sua sponte competency hearing because "[t]he trial judge had significant evidence suggesting that White knew that he was on trial for serious crimes and that a potential consequence could be life imprisonment." *Id.*

Dreyer is not entitled to any relief under *White*'s analysis.[1] In fact, there is even less evidence of incompetence here than in *White*. There were no outbursts and Dreyer was able to acknowledge his rights and ask questions during the sentencing hearing. Dreyer was also able to participate respectfully and appropriately. *Id.* Additionally, the doctors' reports did not undermine the district court's determination—based on its experience with Dreyer and his demeanor—that Dreyer was competent to be sentenced. Dreyer is suffering from the early stages of FTD, and while the medical record indicates that he may have impaired judgment and lowered inhibitions, there is no indication in any of the three medical reports that he did not understand the proceedings against him and could not adequately participate in his own defense. *See Fernandez*, 388 F.3d at 1251.

---

[1] The majority cites *White* for the proposition that "we must conduct, as *White* reaffirms, a 'comprehensive [review] not limited by either the abuse of discretion or clearly erroneous standard.'" Maj. Op. at 26, n.3. Unlike the situation in *White*, where White's competence was repeatedly questioned in the trial court and White's multiple outbursts interrupted the trial, here Dreyer's competence to be sentenced is raised for the first time on appeal. Thus, *White* is not contrary to our decisions providing that where "the issue is raised for the first time on appeal, we review a district court's decision not to sua sponte order a competency hearing for plain error." *See Marks*, 530 F.3d at 814 (citing *Fernandez*, 388 F.3d at 1250–51). Moreover, that *White* involved a defendant who had already had one competency hearing is a distinction without a difference since competency is an ongoing question and should be evaluated at every stage of the proceedings. What is relevant in *White* is its factual analysis of the trial judge's observations of the defendant's behavior in the courtroom in combination with the reports about the defendant's mental health. *White*, 670 F.3d at 1081–84. Here, Dreyer's reasonable behavior in the court was consistent with the medical reports indicating that he was competent to be sentenced.

### E.  Any Error Did Not Affect the Fairness, Integrity, or Public Reputation of the Judicial System.

Even if the district court erred in proceeding to sentence Dreyer (which it did not), under *Marks*, Dreyer would only be entitled to relief if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *See Marks*, 530 F.3d at 814 (quoting *Thornton*, 511 F.3d at 1225 n.2).  Dreyer fails to demonstrate that there is any error rising to this level.  Here, Dreyer was represented by counsel, who having obtained medical evaluations of Dreyer after he pleaded guilty, did not alert the court that Dreyer was incompetent to be sentenced.  *Cf. Douglas*, 316 F.3d at 1085 (finding that attorneys have a duty to request a competency hearing "if there is evidence to suggest that the defendant is impaired").  Therefore, Dreyer's attorney's failure to do so was a strategic choice based on his belief in his client's competence.  Dreyer's attorney only referenced these medical reports to seek leniency in sentencing.  In this context, the fairness, integrity, and public reputation of the judicial proceedings would not be blemished by the Court's denial of relief based on an issue raised by counsel for the first time on appeal.

## V.  Conclusion

Because the district court reasonably concluded that Dreyer was competent to be sentenced, I dissent from the majority's opinion.  First, although Dreyer's medical evaluations indicate that he suffers from FTD and has some related mental deficiencies, none of the reports indicate that these deficiencies interfered with his ability to consult with his lawyer or to understand the proceedings against him.

Second, although Dreyer chose not to allocute, neither the records nor the district court's observations of Dreyer's behavior in the courtroom indicate that he was incompetent to be sentenced. Third, none of the cases cited by the majority support granting relief to a represented defendant who behaves normally in court and has no compelling evidence of incompetence. Fourth, granting Dreyer relief is inconsistent with out recent opinion in *White*, directing deference to the trial judge's judgment. Fifth, even if the district court did err, the error does not seriously affect the fairness, integrity, or reputation of the judicial proceedings. In sum, the majority improperly substitutes its evaluation of Dreyer, based on a cold and inconclusive record, for the trial judge's determination that was based not only on the medical record but on Dreyer's conduct in court. Because the district court did not err in sentencing Dreyer without sua sponte ordering a competency hearing, I would affirm.[2]

---

[2] Our differing opinions as to the need to hold a competency hearing should in no way affect the district court's determination of Dryer's competency following the mandated competency hearing.